## NORTHERN PAC. RY. CO. v. ADAMS COUNTY et al.

CHICAGO, M., ST. P. & P. R. CO. et al. v. SAME.

SPOKANE, P. & S. RY. CO. v. SAME.

Nos. E–4300, E–4314, E–4338, E–4305.

District Court, E. D. Washington, N. D.

July 9, 1932.

D. F. Lyons, of St. Paul, Minn., and C. A. Murray and L. B. daPonte, both of Seattle, Wash., for Northern Pac. Ry. Co.

F. M. Dudley, I. S. Crawford, and A. J. Laughon, all of Seattle, Wash., and Garrecht & Twohy, of Spokane, Wash., for Chicago, M., St. P. & P. R. Co.

Charles A. Hart and Carey, Hart, Spencer & McCulloch, all of Portland, Or., for Spokane, P. & S. Ry. Co. .

R. M. Burgunder, Pros. Atty. for King County, and Harry A. Rhodes, both of Seattle, Wash., Bertil E. Johnson, Pros. Atty. for Pierce County, and D. D. Schneider, Deputy Pros. Atty. for Pierce County, both of Tacoma, Wash., Charles W. Greenough, Pros. Atty. for Spokane County and A. O. Colburn, Deputy Pros. Atty. for Spokane County, both of Spokane, Wash., John H. Dunbar, Atty. Gen., John A. Homer, Asst. Atty. Gen., and William G. Graves, of Spokane, Wash., for King, Pierce, and Spokane Counties.

John W. Brisky and Thomas K. Chambers, both of Mt. Vernon, Wash., for Skagit County.

Charles R. Denney, of Everett, Wash., for Snohomish County.

R. G. Sharpe, of Seattle, Wash., Charles L. Powell, of Kennewick, Wash., George O. Beardsley, of Prosser, Wash., Dale McMullen and Joseph E. Hall, both of Vancouver, Wash., Cecil O. Hallin and J. E. Stone, both of Kelso, Wash., Paul O. Manley and J. C. Graham, both of Aberdeen, Wash., Spencer D. Short, of Ellensburg, Wash., Fred A. Smith, of Goldendale, Wash., R. M. Wright, of Stevenson, Wash., E. W. Schwellenbach, of Ephrata, Wash., William H. Grimm, of Centralia, Wash., Harold P. Troy, of Olympia, Wash., Bernard J. Lehrer, of Walla Walla, Wash., Lawrence M. Keplinger and Frank M. Allyn, both of Bellingham, Wash., and Ole Sandvig, of Yakima, Wash., for Benton, Clarke, Cowlitz, Grays Harbor, Kittitas, Klickitat, Skamania, Grant, Lewis, Thurston, Walla Walla, Whatcom, and Yakima Counties.

George H. Freese, of Ritsville, Wash., Wm. W. Bruce, of Port Angeles, Wash., E. W. Clark, of Dayton, Wash., C. M. O'Brien, of Pasco, Wash., John I. O'Phelan, of Raymond, Wash., W. J. Daly, Jr., of Port Townsend, Wash., Maurice W. Orth, of Bremerton, Wash., Floyd J. Underwood, of Davenport,

Wash., J. W. Graham, of Shelton, Wash., E. L. Sheldon, of Newport, Wash., and John D. Evans, of Colfax, Wash., for Adams, Clallam, Columbia, Franklin, Jefferson, Kitsap, Lincoln, Mason, Pacific, Pend Oreille, and Whitman Counties.

WEBSTER, District Judge.

These causes are now before the court on exceptions to the report of the special master to whom the cases were duly referred. The exceptions go to the merits of the entire controversies involved in the cases respectively. Milwaukee cases Nos. E–4314 and E–4338 were consolidated, and all of the cases were tried together to the special master who has dealt with them in a single report. Since there are many fundamental questions to be considered which are common to all the cases, I shall treat them in a single memorandum, resorting to separate discussion where such course is imperative or deemed convenient.

All of the cases have to do with the assessment and taxation of the operating property of the complainants, respectively, located in the state of Washington and properly subject to taxation therein. The Northern Pacific Company case assails assessments of its property for the years 1925 and 1926; the Milwaukee Company cases the assessments of its property for the years 1926 and 1927, and the Spokane, Portland & Seattle Company case the assessment of its property for the year 1926 only. In each case the use of fundamentally erroneous principles and grossly excessive base valuation of the property is charged, and it is also claimed that there was unjust discrimination practiced in allocating base value to the several counties through which the railroads respectively run, in that the railroad property was assessed at a higher ratio of assessed to actual value than that used in the case of other taxable property. Hence both base value and county ratios are involved, and independent consideration must be given to each.

It is insisted by the complainants that the state assessing authorities either proceeded upon fundamentally erroneous principles, or adopted fundamentally erroneous methods in valuing the property, or were guilty of fraud, actual or constructive. The special master found that there was no actual fraud on the part of the assessing officials in making the assessments complained of, but found constructive fraud both in fixing base values and in allocating such values to the counties entitled to share in the resulting taxes. In respect of base value, he found that the proper-

ties of the complainants had been grossly overvalued, and in the case of allocation found that such property had been valued on a grossly excessive ratio of assessed to actual value, as compared with the assessment of other property in the counties involved. With regard to the master's finding that there was no actual fraud in fixing base value, it will suffice to say that I entertain the same view, and no useful purpose would be served by elaborating on this feature of the cases. Whether there was constructive fraud, or the application of fundamentally erroneous principles or methods, in making the assessments complained of, is therefore the primary question presented for decision. I shall first consider base values, and then pass to the question of alleged discriminating county ratios.

In the complaint of the Northern Pacific Company it is alleged that in 1925 and 1926 the value of its property was $85,000,000; that for 1925 it was assessed at $126,460,000, and for 1926 at $131,200,000. The consolidated complaints of the Milwaukee Company allege that the value of its property in 1926 was $19,968,000, and in 1927 was $20,081,647, but was assessed for both years at $50,100,000. The Spokane, Portland & Seattle Company alleges that in 1926 the value of its property was $24,010,446, but for that year was assessed at $36,000,000.

At the threshold we encounter the question of, How is the operating property of a railroad in the state of Washington to be assessed for taxation therein, and by what standard shall the conduct of the state's assessing authorities in valuing such property for taxation be tested when their official action is collaterally assailed in equity upon the ground of constructive fraud or the use of fundamentally wrong principles or methods?

Section 1 of article 7 of the Constitution of Washington provides: "All property in the state not exempt under the laws of the United States, or under this constitution, shall be taxed in proportion to its value, to be ascertained as provided by law."

Section 2 of the same article provides: "The legislature shall provide by law a uniform and equal rate of assessment and taxation on all property in the state, according to its value in money, and shall prescribe such regulation by general law as shall secure a just valuation for taxation of all property, so that every person and corporation shall pay a tax in proportion to the value of his, her, or its property."

Section 3 of the same article provides:

"The legislature shall provide by general law for the assessing and levying of taxes on all corporation property as near as may be by the same methods as are provided for the assessing and levying of taxes on individual property."

The statute of Washington under which the offending assessments were made is chapter 130, p. 227, Laws of Washington, Extraordinary Session 1925. Under this act, railroad operating property is assessed by the state tax commission between the 1st day of March and the 1st day of June in each year. Section 43 (page 253). This assessment is required to include "all franchises, rights of way, road beds, tracks, terminals, rolling stock equipment and all other real and personal property of such company, used or employed in the operation of the railroad or in conducting its business, and shall include all title and interest in said property, as owner, lessee or otherwise." Section 36, par. 4 (page 245). Real property not adjoining a railroad company's tracks, stations, or terminals, and real property not used in the operation of the railroad, are excepted, and shall be assessed in the same manner as like property of individuals. This act provides that all property shall be assessed at 50 per cent. of its true and fair value in money, and it further provides: "The true cash value of property shall be that value at which the property would be taken in payment of a just debt from a solvent debtor." Section 52 (page 259).

Section 44 of the act (page 254) in part reads: "In case of railroad or telegraph companies which own or operate railroad or telegraph lines lying partly within and partly without the state the said commission shall only value and assess the property within this state. In determining the value of the portion within the state, the commission shall take into consideration the value of the entire system, the mileage of the whole system, and of the part within this state, together with such other information, facts and circumstances as will enable the commission to make a substantially just and correct determination."

From the foregoing it will be seen that under the Constitution and laws of Washington all nonexempt property must be taxed in proportion to its value; that there must be a uniform rate of assessment and taxation of all property according to its value in money, that is to say, that value at which the property would be taken in payment of a just debt from a solvent debtor, so that every person shall be taxed in proportion to the value of his property; that corporate property shall be assessed and taxed as near as may be by the same methods as those employed in the case of individual property; and that all property shall be assessed at not to exceed 50 per cent. of its true and fair value in money.

The makers of the state Constitution were not unmindful of the tremendous difficulties to be encountered in assessing corporate property, especially when such property consists of a portion of a vast interstate railway system, and consequently did not provide that exactly the same methods shall be employed in assessing such property as are used in assessing individual property. They were careful to say that in assessing and taxing corporate property the same methods as near as may be shall be used as in the case of property owned by individuals. As near as may be clearly does not mean in precisely the same manner, nor does it mean as nearly as is physically possible without regard to convenience, practicability, or expense. Appreciating the inherent differences between vast corporate holdings and comparatively small individual ownerships, it meant to provide for a similarity of method only to the extent that such similarity is feasible, practicable, and reasonable—a similarity such as the nature and character of the two classes of property will sensibly permit.

By section 44 of the act of 1925, the duty is imposed upon the tax commission to make a substantially just and correct determination of the value of railroad operating property in the state for the purpose of taxation, and in the performance of this task the commission is commanded to take into consideration system value, mileage of the whole system and the part thereof within the state, "together with such other information, facts and circumstances as will enable the commission to make a substantially just and correct determination." The Legislature of Washington has not seen fit to define any method by which railroad property in this state shall be valued for taxation by the tax commission. It directs that certain things shall be considered by the commission, but it has not laid down any specific or definite method of ascertaining value. The method to be employed, therefore, is left to the quasi judicial discretion of the tax commission. Hence any lawful method by which a substantially just and correct determination of value can be arrived at is within the com-

mission's power to use, so long as it takes into consideration the things which the statute prescribes. In judicially reviewing the action of the commission, the legitimate exercise of this discretion must not be withdrawn or unduly curtailed. The matter of valuing property for taxation is not primarily a judicial function, and, when courts are called upon to examine an assessment of property for taxation by the duly constituted assessing and taxing officials, great care must be taken not unduly to interfere with the discretion which is confided to the assessing and taxing agencies set up for that purpose by legislative authority. To be sure, there must be no arbitrary or capricious exercise of discretion on the part of the assessing officials. Their quasi judicial discretion, like judicial discretion itself, must be exercised within legitimate limits. Taxation, however, is an intensely practical matter. It is not an exact science in which there is no room for the exercise of judgment and discretion. Valuing property for taxation is not a formulaic process. Much must be left to the knowledge, judgment, and discretion of the assessing officials, and this is true no matter what the character of the property to be valued may be. The facts and circumstances of the particular case must ever be kept in mind, and the performance of the task must be guided by legally permissible principles. The factors or indicia of value must be such as are recognized by law as proper criteria of value, and a substantially just and correct determination must be the objective or goal. So long as assessing officers confine themselves within this field, their official conduct is immune from collateral judicial attack. The tax commission is created for the purpose of using its judgment and discretion, and "within its jurisdiction, except, as we have said, in the case of fraud or a clearly shown adoption of wrong principles, it is the ultimate guardian of certain rights. The state has confided those rights to its protection and has trusted to its honor and capacity as it confides the protection of other social relations to the courts of law." C., B. & Q. Ry. Co. v. Babcock, 204 U. S. 585, 598, 27 S. Ct. 326, 329, 51 L. Ed. 636.

"The findings of an official body such as the Board of Valuation and Assessment, * * * are quasi-judicial in their character, and are not to be set aside or disregarded by the courts unless it is made to appear that the body proceeded upon an erroneous principle or adopted an improper mode of estimating the value of the franchise, or unless fraud appears." Louisville &

Nash. R. R. Co. v. Greene, 244 U. S. 522, 536, 37 S. Ct. 683, 690, 61 L. Ed. 1291, Ann. Cas. 1917E, 97.

In Templeton v. Pierce County, 25 Wash. 377, 381, 65 P. 553, 554, the Supreme Court of Washington said: "Where the assessing officer has exercised an honest judgment, and no fraud or arbitrary or capricious action in making the assessment is shown or can be presumed, the court will not interfere."

In Hillman's S. C. L. & R. Co. v. Snohomish County, 87 Wash. 58, 61, 151 P. 96, 98, it is said: "In Templeton v. Pierce County, supra, the court reviewed many of its prior decisions, summarizing them to the effect that the court will grant relief against an arbitrary, fraudulent or maliciously excessive valuation by the assessing officer, and fraud may be presumed from a palpably exorbitant overvaluation, but where the assessing officer has exercised an honest judgment and no fraudulent, arbitrary or capricious action in making the assessment is shown or can be presumed, the court will not interfere."

In Weyerhaeuser Timber Co. v. Pierce County, 97 Wash. 534, 543, 167 P. 35, 38, we find this language: "It is well settled that the assessor and board of equalization act in a quasi judicial capacity, that the law presumes that they have performed their duties in a proper manner, that this presumption will be liberally indulged, and that the evidence to overthrow it must be clear. * * * But it is equally well settled in this state that, where the evidence shows arbitrary or capricious action on the part of the assessing officer, rather than the exercise of an honest judgment, or shows that he proceeded upon a fundamentally wrong basis or theory, in making the assessment, the courts will grant relief against an overvalution of real property, and this regardless of the action of the board of equalization."

Additional cases to the same effect, both state and federal, might be cited almost without number, but the foregoing will suffice to define the controlling principles by which the action of the tax commission is to be tested. There is no direct evidence in the record showing the methods which were employed by the tax commission in making the offending assessments. No member of the commission took the stand to explain the basis or bases upon which the commission acted in valuing and assessing the properties. No record of the commission shedding light on the method used was produced in evidence. It requires no argument to demonstrate that this attitude on the part of the commission

does not foreclose all inquiry into the legality of their determinations. It merely serves to make necessary a different and obviously more difficult method of approach. In order to determine whether their valuations were properly made or are tinctured with constructive fraud arising out of gross excessiveness, it becomes necessary to consider whether, under any legally permissible method or combination of methods recognized by law for ascertaining value, their action can be upheld as within the proper and legitimate exercise of their powers and discretion. This will be the standard of measurement which I shall apply in reaching my conclusions in this regard.

The special master was of the opinion that the best, most scientific, and most logical method of ascertaining base value of railroad operating properties for taxation purposes is the so-called "stock and bond" method in all cases where such securities are freely bought and sold on the stock exchange. This method was used by him in the Northern Pacific and Milwaukee cases, but in the Spokane, Portland & Seattle case he used the so-called "capitalization of net operating income" method, because the stock in this company is owned equally by the Northern Pacific Company and the Great Northern Company, and is not bought or sold on the stock market. In determining whether the valuations placed by the commission on the properties of the Northern Pacific Company and the Milwaukee Company were so grossly excessive as to warrant relief in equity, he applied the stock and bond method exclusively, averaging the market prices of these securities over a period of one year, and, in the case of the Spokane, Portland & Seattle Company, he used the capitalization of net income method exclusively, calculating this on a one-year period. In both instances he concluded that the commission's valuations were erroneously made, were grossly excessive, and should not be upheld.

Regardless of the result obtained, I am constrained to believe that in pursuing this course the learned special master fell into error. It is not the function of courts to see to it that taxing systems shall be the wisest and best that can be conceived or devised by economists or experts in the field of taxation. Assessment of taxation is essentially a legislative function. With the wisdom or propriety of tax laws courts can have nothing to do. The question with which I am now confronted is not the ascertainment of what is the best method of taxing railroad operating property. The precise question present-

ed is whether the tax commission has stayed within the bounds of the laws of Washington prescribing their powers and duties with respect to the assessment of such properties for taxation. Inasmuch as the Legislature of Washington has not defined specifically how railroad property shall be valued for taxation, I am of the opinion that the proper way of testing whether the action of the state tax commission can be upheld is to inquire whether under any legally authorized method or methods its determinations can be justified and sustained. The method pursued by the special master greatly curtails, if indeed it does not completely withdraw from the commission, the exercise of its statutory discretion, whilst the method which I feel obliged to follow grants to the commission the fullest exercise of its legitimate discretion in dealing with the matters confided to it.

The special master, in his exhaustive report, says: "The value of a railroad cannot be segregated into separate values for each of the many things which affect the desire to exchange money for it, nor is a railroad itself a divisible thing. It is a unit. It cannot be sold by the mile, nor the foot, or divided into miles or feet, as one mile of the road is of very little use of and by itself, and a division of a railway into its physical parts will destroy its value as a railway; nor, as I have said, can its value be segregated into separate values for the thousand and one things that affect the desire for it. The sum of the value of all the parts of a railroad unit does not necessarily equal the value of the whole as a unit. The demand is for the utility as a whole and not for the parts. We have a new entity whose value can only be found by reference to the new thing built up. A railroad can be valued only as a railroad; if torn asunder it ceases to be a railroad."

He concludes, therefore, that the first step to be taken in valuing that part of an interstate railway lying within any one state is to find the value of the whole transportation system to which it belongs. I find myself in entire accord with these views. They are abundantly sustained in both reason and authority.

"It has been as firmly established as anything can be by judicial determinations that all the property of a public service corporation, such as appellant, street and other railway companies, and public lighting companies, whether real, personal, or mixed, in the ordinary sense of those terms, including fran-

chises other than the mere right to be a corporation, is one entire indivisible thing. * * * In that view it would be the height of absurdity to consider value and impose a tax upon one part of such entire thing separate from the rest. There can be no separation without destruction. Therefore the separate value of the parts in the aggregate would not necessarily approximate to or be any legitimate measure of the value of all the parts, viewed as one complete machine, so to speak. * * * The great value is produced by the combination of parts into one complete working machine, adapted in a high degree to the service of man. One might as well endeavor to value one part of any mechanical device by itself as to so value the franchise of a public service corporation by itself, or so value its land, or likewise its movables. To do so leaves out of view the great and often chief element of value which is produced by the combination." Northern Pac. Ry. Co. v. State, 84 Wash. 510, 533, 534, 147 P. 45, 53, Ann. Cas. 1916E, 1166.

See, also, Pittsburgh, etc., Railway Co. v. Backus, 154 U. S. 421, 14 S. Ct. 1114, 38 L. Ed. 1031.

In a task so great as the one now facing me, I cannot undertake to defend and justify settled principles of law. Their statement will have to be taken as sufficient. In valuing railroad operating property, the microscope cannot be employed. The undertaking must be entered upon in a larger and broader conception of the problem, bearing in mind that there is no perfect method to be used and that reasonable approximation is all that can be accomplished or expected. If unit valuation of the utility is not to be used, the only remaining method would be that of inventory and appraisal, for which method in valuing a railway system I do not feel any one will have the hardihood to argue. It would require wizardry to conceive how the value of a franchise, as that word is used in revenue laws, could be ascertained by such a method of valuation.

What, then, are the legally recognized evidential factors for determining the value of the operating property of a railroad for the purpose of taxation, considering the system as a unit? In other words, what are the permissible methods, factors, or elements to be used in arriving at such value? The authorities recognize as a relevant and highly important factor the value of the corporation's outstanding stock and bonds—the so-called "stock and bond" method. Under this plan, the average market quotations of the stock and bonds over a more or less arbitrarily fixed period of time is found, and this figure is multiplied by the total number of outstanding units of each class of securities. The result is supposed to reflect the value of all the stock and bonds outstanding, and consequently to evidence the value of all the corporation's property or assets. From this amount is deducted the value of the nonoperating property of the corporation, and the residue is taken as the value of its operating property—the property to be assessed. There is no dispute amongst counsel that this is a proper element to be taken into account, but, if there were dispute, the authorities amply sustain it, and I shall leave it there. Yet it is by no means perfect. It is open to many just criticisms. It requires the fixing of a period over which the market quotations shall be averaged, and this of necessity must be a more or less arbitrarily fixed period of time; it assumes that the average value of the stock and bonds actually sold reflects the value of the entire outstanding issues of each, when rarely ever is the controlling interest in stock and bonds of a railroad company bought or sold on the stock exchange, and, where control or ownership of a corporation is sought, it is common knowledge that the securities sharply advance in price; it assumes that the aggregate market value of the stock and bonds issued by a corporation is the same as the market value of the property owned by the corporation and which underlies the securities; it presupposes an idealistic knowledge and state of mind on the part of those who deal in such securities on the stock exchange, in that it assumes that the purchasers of the securities act upon an informed judgment based upon accurate information as to the character and extent of the assets of the corporation whose securities are involved; and it largely ignores the influence of pure speculation in the market on the part of those who do not even pretend to possess accurate information with respect to the assets and affairs of the corporation whose securities are bought and sold. As was aptly said recently in a public address by a distinguished executive of a large life insurance company: "What is the Stock Exchange? It is merely a place where public auctions are held. It differs from other auctions only in the articles sold, and in the volume of the transactions. It is no more true of this auction than of other auctions, that the prices bid are an infallible index of the real value of the articles dealt in. The quotations fluctuate with the optimism or the pessimism of the

bidders. They are frequently much better evidence as to the bank accounts and credit of the bidders than of the value of the stocks bought and sold."

In the intensely practical and serious process of administering justice, it will not do to accept as true as a matter of theory that which one knows to be false as a matter of fact. The stock and bond method, to my mind, is much safer as a factor of value in a composite made up of that element together with other relevant factors operating as checks and balances than it is as an exclusive standard of measurement.

■ The law also recognizes the capitalization of net operating income as an important element in ascertaining the value of railroad property for taxation. As this proposition is not disputed, I shall not pause to deal with the authorities which support it. By this method the net railway operating income is averaged over some more or less arbitrarily determined period of time, and the amount thus ascertained is capitalized at some more or less arbitrarily fixed rate of return. The result is supposed to fix the value of the property upon which the earnings are made. This, like the stock and bond method, whilst a recognized factor of value, is also subject to valid criticism. Both the test period for earnings and the rate of capitalization must be fixed with more or less arbitrariness, and by its use the future prospects of the road are reflected by past earnings exclusively. Usually it is not difficult to ascertain the net operating earnings of the railroad, but it is not always so easy to fix the test period, or to determine the proper rate of capitalization to be applied. It also assumes competent and economical management of the business. Obviously it cannot be used in the case of a newly constructed road with no past history of earnings. It is, when available, however, a valuable guide in arriving at base value if it be applied with circumspection and without slavish adherence to it. The truth of the matter is that no single factor is a magic wand or an Aladdin's lamp.

I come next into the hotly contested field of whether cost of reproduction less depreciation is a relevant factor to be considered, and, if so, to what extent, in determining value for taxation. The special master rejected reproduction cost entirely. He was induced to this conclusion by two considerations: First, that reproduction cost bears no logical relation to value for taxation; and, second, that this method is proscribed by the statutes of Washington and the decisions of the Supreme Court of that state.

■ Since, as I have said, my task is to determine what factors or elements of value may legally be taken into consideration, I am necessarily more concerned with the holdings of courts than with the theories of economists or the reasoning of logicians, which must be addressed to the lawmaking tribunals. It is familiar learning that reproduction cost less depreciation is a very important element in ascertaining the value of corporate property for rate-making purposes. Since the decision of 1898 by the Supreme Court in Smyth v. Ames, 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819, there has been little room for doubt on that point. But is it a proper factor in determining value of corporate property for taxation purposes? It is not sound to say that a given property can have but one value, and that that value must be taken in every instance where the value of such property is involved. To reach such a conclusion is to ignore fundamental considerations. In valuing railroad property for taxation, the value of the utility is the thing sought. In Cleveland, etc., Railway Co. v. Backus, 154 U. S. 439, 14 S. Ct. 1122, 1124, 38 L. Ed. 1041, Mr. Justice Brewer, speaking for the court, said: "The rule of property taxation is that the value of the property is the basis of taxation. It does not mean a tax upon the earnings which the property makes, nor for the privilege of using the property but rests solely upon the value. But the value of property results from the use to which it is put, and varies with the profitableness of that use, present and prospective, actual and anticipated. There is no pecuniary value outside of that which results from such use. The amount and profitable character of such use determines the value, and if property is taxed at its actual cash value it is taxed upon something which is created by the uses to which it is put."

In the same case this pertinent language is found: "Will it be said that the taxation must be based simply on the cost, when never was it held that the cost of a thing is the test of its value?"

In Oregon-Wash. R. & Nav. Co. v. Thurston County, 98 Wash. 219, 231, 167 P. 930, 935, the Supreme Court of Washington say: "It is, of course, a necessary rule that, in valuing a railroad, the first inquiry is as to its actual cost. That, prima facie, is its value. But if it appears that the actual cost was in excess of the necessary cost, the nec-

essary cost is the proper standard. If it further appears that the net income of the road does not amount to current rates of interest on its necessary cost, and is not likely to do so, or if the business of the road is likely to be destroyed or impaired by competition or other cause, or if the utility of the road is not equal to its cost, then its value is less than its cost, and must be determined by reference to its utility alone."

In ascertaining a basis for a rate structure, the purpose is to fix a standard of value upon which the corporation is entitled to earn a fair return, if it can. This, however, does not establish the value of the utility of the property. It is not the taxable value of the property, unless the structure authorized is put into successful operation. When actual results equal permissible results, then, and then only, is the rate basis the actual and taxable value of the property. This is clearly pointed out by the Circuit Court of Appeals for the Eighth Circuit in Temmer v. Denver Tramway Co., 18 F.(2d) 226, 228: "An examination of the constituent elements which go to make up value for the purpose of determining a rate of fares to be charged in order to obviate confiscation discloses, aside from the practical difficulties of the situation, that the rating base value furnishes no proper or legal criterion on which to bottom actual value."

Again at page 229 of 18 F.(2d) it is said: "But nevertheless these differences of constituent elements illustrate the fairly clear distinction existing, between value for rate-making purposes, and fair, market, or actual value, and we think show that the former does not necessarily bear any conclusive, legal relation to the latter."

I have not overlooked the language of Judge Chadwick in State ex rel. v. Clausen, 63 Wash. 535, 116 P. 7, to the effect that property can have but one value whatever may be the purpose of the investigation, be it for rate making or for taxation. This statement, however, is pure dictum, and it involves the error of confusing maximum value allowable as a rate base and actual value enjoyed under the rate structure rested thereon. As said by Mr. Justice Brandeis in his separate opinion concurred in by Mr. Justice Holmes, in State of Missouri ex rel. v. Public Service Commission, 262 U. S. 310, 43 S. Ct. 544, 554, 67 L. Ed. 981, 31 A. L. R. 807: "Value is a word of many meanings. That with which commissions and courts in these proceedings are concerned, in so-called confiscation cases, is a special value for rate-making purposes, not exchange value. This is illustrated by our decisions which deal with the elements to be included in fixing the rate base."

In Chicago & N. W. Ry. Co. v. Eveland (C. C. A.) 13 F.(2d) 442, 447, Judge Sanborn made a careful examination of the authorities in an effort to ascertain the proper elements to be considered in valuing a railroad for taxation, and concluded that: "In determining the value of the property of a railway company * * * many classes of evidence are competent, but (1) the value of the use of such property in the operation of its railroads and its net revenue from such use, and (2) the current market value of its stocks and bonds are among the most persuasive and authoritative—far more so than the cost of the property or the cost of its reproduction new in cases in which the property is in operation and has been for many years."

In Standard Oil Co. v. So. Pacific Co., 268 U. S. 146, 45 S. Ct. 465, 467, 69 L. Ed. 890, involving the market value of a vessel destroyed in a collision, Mr. Justice Butler, writing, said: "And by numerous decisions of this Court it is firmly established that the cost of reproduction as of the date of valuation constitutes evidence properly to be considered in the ascertainment of value"—citing many cases including confiscation or rate cases. He proceeds immediately to say, however: "It is to be borne in mind that value is the thing to be found and that neither cost of reproduction new, nor that less depreciation, is the measure or sole guide. The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts"—citing in support the Minnesota Rate Case, 230 U. S. 352, 434, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18. Since in this case the court was dealing with market value, the holding must be taken to mean that cost of reproduction may be considered in the ascertainment of such value, provided it be not adopted as the sole guide to the exclusion of other relevant facts. In Harris Trust & Savings Bank v. Earl, 26 F.(2d) 617, 618, the Circuit Court of Appeals for the Eighth Circuit said: "But it is not the law that the valuation of railroad or other property for taxation purposes is to be determined from any single factor. As bearing upon the proper result, many facts have evidential value. Certain-

ly, among others, are to be considered original cost, cost of reproduction less depreciation, bonded indebtedness, current market value of stock and bonds, and earning capacity. Of these the two last named are of the greatest significance. Chicago & Northwestern Railway Co. v. Eveland (C. C. A.) 13 F.(2d) 442. But earning capacity and actual earnings are by no means identical."

The reason for the last sentence is found in the fact that in the case competent and economical management was challenged. In Atchison, T. & S. F. Ry. Co. v. Collins, 294 F. 742, that distinguished jurist, the late Judge Dietrich, sitting as District Judge, had under consideration the California gross revenue statute. In discussing the factors of value properly to be employed in ascertaining the value of the property to be taxed, at page 749, he uses this language: "Through their experts and in the argument, plaintiffs exhibit studies under the 'stock and bond' method, and the 'capitalization of net earnings' method of valuation; and the defendant under the 'appraisal' or 'reproduction cost' method, taking as a basis mainly such appraisals as have been made by and under the direction of the Interstate Commerce Commission. Of the stock and bond method, often easy of application, it is to be said that here the process of computation is necessarily complex and in it there are factors of great uncertainty. With some qualification the same comment may be made upon the net income method. * * * The appraisal or reproduction cost method always involves some factors of uncertainty, and here certain large factors in the nature of estimates; and generally in its application it entails exercise of judgment upon the part of him who applies it. It is commonly recognized that no one of the methods, standing alone, gives assurance of a dependable result, and that it is safer to take the composite view resulting from a consideration and application of all of them. * * * The objection is, not that such appraisal is inaccurate or untrustworthy, but that it was made for rate-making purposes rather than for taxation purposes, and that therefore it is incompetent for use in these suits. I am aware that in certain quarters a wide difference of view exists touching this general question. While I am not of the opinion that properly there can be but 'one valuation, in the long run valuation for rate-making purposes and valuation for taxation purposes should closely approximate each other. There are common factors, and necessarily there is a measure of interdependence. True, by statutory definition and declaration, the two may be entirely segregated, but such segregation would be artificial. It is further true that without the statutory definition, and where the effort is to ascertain a fair value for rate-making purposes and a fair value for taxation purposes, cases may and often do arise where there are differentiating considerations. If the railroads could always make a fair net return upon the fair valuation established for rate-making purposes, and only a fair return, I see no reason why, generally speaking, the fair valuation for such purpose should not also be taken as a fair valuation for taxation purposes. However that may be, considerations of public policy strongly argue for a constant endeavor to keep the two valuations close together."

█ I shall not undertake further discussion of the cases. From the ones already noticed I feel that the true rule can be fairly extracted. Valuation for rate-making purposes and valuation for taxation purposes are not necessarily the same; the former being a basis upon which the corporation is entitled to a fair return, if it can succeed in earning it, the latter valuation being that reflected by the use of competent factors and elements reasonably calculated to disclose the actual results in fact enjoyed in the practical operation of the utility or which ought to have been obtained under competent, honest, and economical management—the one measuring what is permissible, the other what is achieved or should have been achieved. With this fundamental distinction in mind, it is permissible to give consideration to reproduction cost in valuing railroad property for taxation, but in this field it is a far less influential factor than it is in the process of fixing a rate base. In the task of fixing a rate base in confiscation cases, "the value of the use, as measured by return, cannot be made the criterion when the return itself is in question." Minnesota Rate Case, 230 U. S. 352, 461, 33 S. Ct. 729, 765, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18. Since value of the utility is the objective sought in fixing value for taxation, the factor of reproduction, less depreciation, must not be allowed to play the part of establishing a purely theoretical value having no just or reasonable relationship to the actual value in fact enjoyed by the owner whose management of the utility is not questioned. It was this consideration no doubt which induced the court in the Eveland and Harris Trust & Savings Bank Cases, supra, to say in effect that, in valuing for taxation, reproduction cost is a factor of secondary importance. It

was this same consideration, I have no doubt, which prompted Judge Dietrich in the Collins Case, supra, to say: "If the railroads could always make a fair net return upon the fair valuation established for rate-making purposes, and only a fair return, I see no reason why, generally speaking, the fair valuation for such purpose should not also be taken as a fair valuation for taxation purposes." To be sure, if the value of the use equals the amount of the rate base, an ideal situation exists, and the property should be taxed accordingly. To say this, however, sheds little, if any, light on the evidential value of reproduction cost in an effort to ascertain the value of the utility. Where other means of finding value are not available, reproduction cost may exert great influence, but, where factors are at hand directly shedding light on what the owner actually enjoys in the use of the property for the purpose to which he has devoted it, reproduction cost may have very scant value. After all, its evidential worth as a factor in ascertaining market value must be found in the relationship which it bears to actual results or what ought to have been accomplished in the use of the property, and weight be given it in the light of such relationship, taking into consideration the peculiar facts of the case in hand.

Do the statutes or decisions of Washington forbid the use of reproduction cost? In 1905 there was established in Washington a regulatory board called the Railway Commission (Laws 1905, p. 145). The name of this administrative agency was changed in 1911 to the Public Service Commission (Laws 1911, p. 538). In 1907 the commission was directed by the Legislature, among other things, to value all railroad property in the state, and in that connection to ascertain the cost of reproducing such property in its then condition.

Section 5 of this act (Laws 1907, pp. 545, 548), provided: "The findings of the Commission so filed, or as the same may be corrected by the courts, when properly certified under the seal of the Commission, shall be admissible in evidence in any proceeding or hearing in which the public and the railroad or express company affected thereby is interested, and such findings, when so introduced, shall be conclusive evidence of the facts stated in such finding or findings as of the date of filing under conditions then existing, and such facts can only be controverted or contradicted by showing a subsequent change in conditions bearing upon the facts therein determined."

In 1909, pursuant to the legislative mandate, the commission made and promulgated a valuation of the property of all railroads operating in the state, based upon reproduction cost. By act of the Legislature of 1907, it was made the duty of the state board of tax commissioners, created by the act of 1905, to make an annual assessment of all the operating property of railroads within the state. In State ex rel. v. Clausen, supra, it was decided by the Supreme Court of Washington that the value of a railroad's operating property within the state, as found by the railroad commission, was binding upon the tax commission, and that that commission had no power to fix a different value for the purposes of taxation. This case was decided in June, 1911. In 1913 (Laws 1913, p. 662) an act was passed making a change with respect to the force and effect of the findings of the Railroad Commission as applied to matters of taxation, the pertinent language in this regard reading: "The findings of the commission [Public Service Commission] so filed, or as the same may be corrected by the courts, when properly certified under the seal of the commission, shall be admissible in evidence in any action, proceeding or hearing, excepting with respect to matters of assessment and taxation, in which the state or any officer, department or institution thereof, or any county, municipality, or other body politic and the public service company affected is interested, whether arising under the provisions of this act or otherwise, and such findings when so introduced shall be conclusive evidence of the facts stated in such findings as of the date therein stated under conditions then existing, except as a basis for taxation, and such facts can only be controverted by showing a subsequent change in conditions bearing upon the facts therein determined." Section 1.

From this legislative and judicial history the special master concluded that by the act of 1913 the tax commission was legislatively precluded from taking into consideration the element of reproduction cost in assessing railroad property for taxation. In his report he says: "By the act of 1913 I think the taxing officials were instructed how not to value a railroad." After careful consideration, I find myself unable to subscribe to this view. At the 1913 session of the Legislature, other amendments were made to the laws relating to the assessment of railroad property. One provided that property shall be assessed at not to exceed 50 per cent. of its fair value, instead of at its full fair value, as theretofore. Laws 1913, c. 140, p. 438. At this

same session (Laws 1913, p. 662) there was omitted from the Public Service Commission Act the provision that nothing less than the value fixed by the Public Service Commission should be taken as the value of property for taxation, as provided in the act of 1911. Laws 1911, c. 117, pp. 601, 604, § 92. In dealing with the question of what was the purpose and effect of the 1913 amendment, with respect to the findings of the Public Service Commission in their relation to matters of assessment and taxation, the Supreme Court of Washington, in Northern Pac. R. Co. v. King County, 93 Wash. 89, 95, 160 P. 8, 10, said:

"We think the amendment of the Public Service Commission Act in the year 1913, to the effect that the findings of the Public Service Commission 'shall be admissible in evidence in any action, proceeding or hearing, excepting with respect to matters of assessment and taxation, in which the state or any officer, department or institution thereof, or any county, municipality or other body politic and the public service company affected is interested, whether arising under the provisions of this act or otherwise, and such findings when so introduced shall be conclusive evidence of the facts stated in such findings as of the date therein stated under conditions then existing, except as a basis for taxation,' refers only to the right of the tax commission to put a different value upon railroad property than that fixed by the Public Service Commission; and that the amendment intended only to avoid the rule theretofore announced in State ex rel. Oregon R. & Nav. Co. v. Clausen, supra. This is plain when we come to consider that, at the same session of the Legislature, by chapter 140, Laws 1913 [Rem. 1915 Code, section 9112], the Legislature provided that property should be assessed at not to exceed 50 per cent. of its true and fair value in money. It was clearly not the intention of the Legislature to require railroad property to be assessed at its true value in money, and at the same time to permit other property to be assessed at 50 per cent. of its value."

██ With so plain a definition of the sole purpose and effect of the amendment as this by the highest court of the state, it hardly seems permissible to conclude that the amendment had the effect attributed to it by the special master, of withdrawing from the tax commission the right to consider reproduction cost or any other proper element of value in assessing railroad property. If the Legislature had intended so important a thing as

that, surely it would not have been content to leave its purpose to implication and inference. Furthermore, the act of 1925 (sections 39, 44), under which the assessments here complained of were made, gives the tax commission the privilege of demanding at the hands of railroad companies without restriction "such other facts and information as said commission may require" to aid it in assessing the property for taxation, and empowers it to "view and inspect" the property. By section 5, subd. 2, c. 18, Laws 1925, p. 35, the tax commission is given access to all records and files of state, county, and municipal officers whose duties make it possible to ascertain value, "including valuations of property of public service corporations for rate making purposes." The implications of this act, to my mind, are vastly stronger that reproduction cost is not taboo as a matter of legislative enactment than they are under the act of 1913 that this element of value is proscribed. I am satisfied that there is nothing in the laws of Washington which precludes the tax commission from taking into consideration in valuing railroad property any proper and relevant factor which the law generally sanctions.

Having now given consideration to the permissible factors or elements which may be used in ascertaining system base value, I shall pass to the problem of how such value may be allocated to the states. The special master, being of the opinion that the standard of allocation should be made up of factors governed largely by the basis upon which the system base value is determined, rejected relative reproduction cost as an element in allocation. Since the net value of the use of the property within the state in ratio to system net value was impossible of ascertainment, that element also was of course excluded. He then proceeded to make up a composite standard of allocation for each company for the years in question, using for this purpose the following elements: (a) Car and locomotive miles made within the state as compared to those made on the system; (b) revenue ton miles, plus revenue passenger miles made within the state as compared with the system; (c) gross earnings derived from the use of the properties within the state as compared with those derived from system use; and (d) the proportionate part of the system's operated track located in the state. To the relative mileage of track factor he gave 50 per cent. value, and to a composite of factors (a), (b), and (c)—so-called use factors—he gave 50 per cent. value. The

resultant figure constituted the standard or measure by which he allocated system base value to the state.

 Obviously no mode of allocation would be permissible which in its practical application would result in assessing property not within the state, or in giving to a particular state a part of system value out of all reasonable proportion to the comparative value of the property in the state to the value of the property of the entire system. So long as this principle is not ignored or violated, there is wide room for the exercise of discretion on the part of assessing officers in allocating system value to a state. Inasmuch as I am endeavoring to ascertain whether the assessments complained of can be sustained on any legal basis, I deem it necessary to inquire whether there is any recognized method of allocation more favorable to the validity of the assessments than the one adopted and used by the special master. Patently the most exact method of allocating system value to a state is on the mileage basis. This method is frequently prescribed by statute, and, in the absence of special circumstances rendering its use improper, is upheld by the courts. It has received the repeated approval of the Supreme Court of the United States. It would seem to require no argument to sustain the proposition that what it is competent for the Legislature to prescribe in this regard it is competent for assessing officers to adopt, when the method of allocation is confided to their discretion. In Pittsburgh, etc., Railway Co. v. Backus, 154 U. S. 421, 14 S. Ct. 1114, 1118, 38 L. Ed. 1031, supra, it is said:

"And, when the statute provides that such property shall be assessed at its 'true cash value,' it means to require that it shall be assessed at the value which it has, as used, and by reason of its use. When a road runs through two states, it is, as seen, helpful in determining the value of that part within one state to know the value of the road as a whole. * * * It is ordinarily true, that, when a railroad consists of a single continuous line, the value of one part is fairly estimated by taking that part of the value of the entire road which is measured by the proportion of the length of the particular part to that of the whole road. This mode of division has been recognized by this court several times as eminently fair. Thus, in State Railroad Tax Cases, on page 608 [of 92 U. S., 23 L. Ed. 663], it was said: 'It may well be doubted whether any better mode of determining the value of that portion of the track within any

one county has been devised than to ascertain the value of the whole road, and apportion the value within the county by its relative length to the whole.' And again, on page 611 [of 92 U. S.]: 'This court has expressly held in two cases, where the road of a corporation ran through different states, that a tax upon the income or franchise of the road was properly apportioned by taking the whole income or value of the franchise, and the length of the road within each state, as the basis of taxation. Delaware Railroad Tax Case, 18 Wall. 206 [21 L. Ed. 888]; Erie Railway v. Pennsylvania, 21 Wall. 492 [22 L. Ed. 595].' The mileage basis of apportionment was also sustained in Western Union Telegraph Co. v. Massachusetts, 125 U. S. 530, 8 S. Ct. 961 [31 L. Ed. 790]; Pullman's Palace Car Co. v. Pennsylvania, 141 U. S. 18, 11 S. Ct. 876 [35 L. Ed. 613]; Maine v. Grand Trunk Railway, 142 U. S. 217, 12 S. Ct. 121, 163 [35 L. Ed. 994]; Charlotte, Columbia, etc., Railroad Co. v. Gibbes, 142 U. S. 386, 12 S. Ct. 255 [35 L. Ed. 1051]; Columbus Southern Railway v. Wright, 151 U. S. 470, 14 S. Ct. 396 [38 L. Ed. 238]. It is true, there may be exceptional cases."

Wallace v. Hines, 253 U. S. 66, 40 S. Ct. 435, 436, 64 L. Ed. 782, was such an exceptional case. The Supreme Court pointed out that: "North Dakota is a State of plains, very different from the other States, and the cost of the roads there was much less than it was in mountainous regions that the roads had to traverse. The State is mainly agricultural. Its markets are outside its boundaries and most of the distributing centers from which it purchases also are outside. It naturally follows that the great and very valuable terminals of the roads are in other States."

The court therefore held that in such circumstances apportionment on the mileage basis could not be used because it would open to taxation property not within the state. Surely the conditions existing in the state of Washington do not call for the same application of the rule laid down in Wallace v. Hines. On the contrary, it is insisted that, because of the location in this state of valuable terminal properties, particularly in the case of the Northern Pacific Company, the relative mileage allocation method is not favorable enough to Washington. Reference will be made to this later. It may here be noted that in Wallace v. Hines main line mileage was involved. The statute of Washington directs that, in determining the value of the portion of a rail-

road within the state, the commission shall take into consideration the value of the entire system, the mileage of the whole system and of the part within this state, and, under another statute, in distributing the state value or assessment to the several counties entitled to share in the resulting taxes, relative mileage allocation is employed exclusively. This legislation would seem to indicate a decided preference on the part of the Legislature for the relative mileage method of allocation. Seeing that relative mileage allocation is more favorable to the validity of the action of the commission than is the composite factor made up by the special master, I shall use relative mileage in testing the validity of the assessment. In fact, relative mileage allocation is more favorable than any other factor suggested save relative reproduction cost alone. In view of what I have said concerning reproduction cost as an element of system base value, it must be obvious that relative reproduction cost cannot be accepted as the sole basis of allocation. If reproduction cost is an element of secondary importance in ascertaining base value, surely it may not be given first and exclusive importance in allocating such value, especially in view of the Washington statutes.

I shall now take up the cases of the several complainants separately, and apply to each the principles which I have laid down for guidance. In their proper places and connections I shall consider the questions of nonoperating property and the basis upon which the stock and bond method shall be calculated.

 First I shall take up the case of the Northern Pacific Company. As I have already said, in the use of the stock and bond method there must be deducted from the total value of the securities the nonoperating property of the corporation. In making his calculations in the use of this method, the special master treated the stock of the Northern Pacific Company in the Northwestern Improvement Company, in the Spokane, Portland & Seattle Company, and in the Burlington Company as nonoperating property. At least this was the effect of his method of dealing with these holdings. To this the defendants take exception, contending that these stocks should have been treated as property used or employed by the Northern Pacific Company in the operation of its railroad, or at least "in conducting its business" within the definition of "property of the railroad company" found in paragraph 4 of section 36 of the act of 1925. Plainly the expression "in conducting its business" means "in con-

ducting its railroad business," paragraph 4 being a definition of operating property. With respect to the Northwestern Improvement Company, it appears that it is a New Jersey corporation, and its entire stock is owned by the Northern Pacific Company. The assets of the improvement company include properties of a variety of kinds. It owns valuable coal and timber lands, and furnishes coal in large quantities to the Northern Pacific Company, though it also sells coal commercially. It is the owner of a large amount of various kinds of securities, including United States bonds. It may be said with some reason that the coal mines are used by the Northern Pacific Company in conducting its railroad business, but surely the securities and moneys owned by the improvement company are not so used. Neither can it be said that its timbered and cutover lands are used in connection with the operation of the railroad. I am of the opinion that, under the evidence, the stock holdings of the Northern Pacific Company in the improvement company are only incidentally and indirectly related to the operation of the railroad. Presumably the real property of the improvement company located in the state of Washington is subjected to taxation therein, but, whether this be so or not, the character of the holdings of the Northern Pacific Company would not be changed. I concur with the special master that the stock of the Northern Pacific Company in the Northwestern Improvement Company should be treated as nonoperating property.

 The question of whether in any circumstances the Northern Pacific Company's holdings in the Spokane, Portland & Seattle Company and in the Burlington Company may be treated as operating property in using the stock and bond method of valuation, as an abstract proposition, is a difficult and perplexing one. It seems plain, however, that, if the stock in the Spokane, Portland & Seattle Company owned by the Northern Pacific Company is to be taken into account in assessing the operating property of the last-named company, then there would have to be a complete revamping or setting aside of the assessment of the Spokane, Portland & Seattle Company's operating property in order to avoid double assessment. Certain it is from the record before me that the state tax commission, in assessing the property of the Spokane, Portland & Seattle Company, treated that company as a separate and independent entity, and not merely as a part of an enlarged system made up of that company,

the Burlington Company, the Northern Pacific Company, and the Great Northern Company; the latter two companies owning equally the entire stock of the Spokane, Portland & Seattle Company. If the Northern Pacific Company's stock in the Spokane, Portland & Seattle Company was taken into account by the tax commission in assessing the operating property of the Northern Pacific Company, then surely, by the same token, the stock of the Great Northern Company in the Spokane, Portland & Seattle Company was taken into account in assessing the property of the Great Northern Company. How, under such a method, $36,000,000 of operating property could remain to be assessed to the Spokane, Portland & Seattle Company as a separate concern is beyond my ability to understand.

We must review what the commission did, or attempted to do, and not be led into by-paths of discussion as to what would have been the effect if some radically different undertaking had been attempted. It cannot be doubted that there is immense benefit to the Northern Pacific Company arising out of its organic or physical connection with the Spokane, Portland & Seattle Company in the West, and with the Burlington Company in the East. But these advantages are necessarily reflected in large part in the market value of the Northern Pacific Company's securities, and also in its net earnings. Nearly all of the capital stock of the Burlington Company is owned by the Northern Pacific Company and the Great Northern Company—each owning approximately one-half thereof. In State v. Northern Pac. Ry. Co., 139 Minn. 473, 167 N. W. 294, the Supreme Court of Minnesota had before it the gross earnings tax statute of that state. This law imposes a tax on the property of a railroad company owned or operated for railroad purposes, and is measured by a fixed percentage of gross earnings. The railroad company paid its gross earnings tax, but nevertheless the state attempted to levy an ad valorem tax on the company's stock in the Burlington Company and in the Spokane, Portland & Seattle Company. The court held that this could not be done because the company, in paying its gross earnings tax, had paid taxes on the Spokane, Portland & Seattle and Burlington stock; such stock being considered property owned or operated by the company for railroad purposes within the meaning of the gross earnings tax statute of Minnesota. Upon the strength of this holding and some additional cases more remotely dealing with the question, it is argued in behalf of

the defendants that, in using the stock and bond method of valuation, the Spokane, Portland & Seattle and Burlington stock of the Northern Pacific Company must be treated as operating property. In the Minnesota case it was conceded that the control of the Burlington had resulted in a large increase in the gross earnings of the Northern Pacific Company and a consequent increase in revenue to the state. The record in the case now before me discloses that the dividends declared by the Northern Pacific on its stock are realized in part from dividends received by it on its stock in the Burlington Company. If the stock of the Northern Pacific Company in the Burlington Company is treated as operating property of the former company, then to the extent of the increase in the market value of the Northern Pacific Company's stock due to its ownership of the Burlington stock there would be a double tax on the same item of value. In the valuation case of Kansas City Southern Ry. Co. et al., 84 I. C. C. 113, 118, the Interstate Commerce Commission said: "If securities issued by other railroads were to be valued to a carrier which owns them, by capitalizing the income derived from them, a duplication of values would result, because the properties constructed or acquired with funds realized through the sale of such securities would necessarily be valued to the railroads issuing the securities, in a capitalization of their net earnings."

The money paid by the Northern Pacific Company for its Burlington stock was obtained through the sale of two series of bonds known as "B" and "C" bonds. The company owns approximately one-half of the Burlington stock and owes the outstanding "B" and "C" bonds. The special master found, and it is not disputed, that the value of the Burlington stock was in excess of the amount owing on the "B" and "C" bonds. The "B" and "C" bonds are a lien upon the stock which is held in trust for the benefit of the bondholders. The special master was of the opinion that in these circumstances, if the "B" and "C" bonds were to be included as operating property, then a corresponding reduction would have to be made of the market value of the Burlington stock. He therefore eliminated from consideration both Burlington stock and series "B" and "C" bonds; That is to say, he set off the one against the other. This method of handling the "B" and "C" bonds and the Burlington stock is as favorable to the defendants as they have any reason to ask, unless the rule announced in State v. Northern Pac. Ry. Co., supra, is

to be applied. Granting for the nonce that the decision in that case is applicable to the method of assessing railroad property provided by the state of Washington, it is as applicable to the holdings of the Northern Pacific Company and the Great Northern Company in the Spokane, Portland, & Seattle Company as it is to their holdings in the Burlington Company. Moreover, if the Burlington stock is not to be treated as nonoperating property to be set off against "B" and "C" bonds in the application of the stock and bond method, then for the same reason, it must be treated as operating property in ascertaining operating income, and the same rule would require, in the ascertainment of cost of reproduction less depreciation, the taking into account of the Northern Pacific Company's part ownership in the Burlington system, as evidenced by its stock in that company. As I have already said, it is apparent that the rule of the Minnesota case was not used by the tax commission in assessing the property of the Spokane, Portland & Seattle Company, and it would be going far to assume that one method was employed in dealing with the same item of property in the case of the Spokane, Portland & Seattle Company, and a directly opposite method was used in the case of the Northern Pacific Company. Surely the Northern Pacific Company's holdings in the Spokane, Portland & Seattle Company were not treated as nonoperating property for the purpose of assessing the Spokane, Portland & Seattle Company, and as operating property in assessing the Northern Pacific Company. Inasmuch as the Spokane, Portland & Seattle stock and bonds and the Burlington stock owned by the Northern Pacific Company stand in precisely the same legal status, can it be assumed that the commission treated the Northern Pacific Company's holdings in the Spokane, Portland & Seattle Company as nonoperating property in assessing the Northern Pacific Company, and treated its holdings in the Burlington as operating property in making that assessment; that is to say, by pursuing the course of taking into consideration the "B" and "C" bonds as operating property and making no corresponding deduction for the value of the Burlington stock? Such a procedure would be of at least doubtful validity in a state whose Constitution requires uniformity in method of assessment.

In view of what obviously was done in the case of the Spokane, Portland & Seattle Company, and in the absence of any evidence or claim that the tax commission, in assessing the Northern Pacific Company, treated as operating property the "B" and "C" bonds, and made no corresponding deduction for Burlington stock, I think it would be running amuck in the search for some abstract theory upon which to uphold the assessments in question to adopt or sanction the suggestion that the rule announced in the Minnesota case must be used by the court in testing the assessments made by the commission. This conclusion finds support in the fact that during the introduction of evidence before the special master there was no suggestion by the defendants of the rule laid down in the Minnesota case. It was approximately a year after the taking of testimony had ended before it was even suggested that the Minnesota rule might have been used by the commission, or ought to be adopted by the master and the court in reviewing its action. The statute of Washington imposes upon the tax commission the duty of taking into consideration the mileage of the system and the part thereof within the state. This, of course, makes it necessary for the commission to determine what comprises or constitutes system mileage. If, in making the assessment of the property of the Northern Pacific Company, the commission had found that the system mileage of that company included approximately one-half of the mileage of the Burlington, is it not strange to the point of amazement that no witness in the case, either for the complainants or the defendants, made reference to this important fact, and that even its suggestion as a possibility by counsel came so belatedly into the record? In the light of these circumstances, I am forced to conclude that the argument of the defendants, based upon the Minnesota case in its relation to these assessments, giving rise as it does to a supersystem method of valuation, is rather fantastic.

There is in the report of the special master a wealth of data furnishing the basis for almost any conceivable calculation for the purpose of comparing values. A myriad of such comparisons have been made, but I shall burden this memorandum with the results of only a few of them for illustration purposes.

Calculation No. 1: Taking the stock and bond method averaged over one year, as used by the special master, and using his figures for nonoperating property, but using the relative mileage allocation factor instead of the allocation factor found by him, the base value of the Northern Pacific Company's

property in Washington for 1925 is $81,-809,941.

Calculation No. 2: Since it is contended that relative mileage allocation does not give the state of Washington the benefit of the company's valuable terminal property located in that state, I have made a calculation on the same basis as immediately above, excepting that I have used as the allocation factor relative reproduction cost, and get the result of $90,266,639.

Calculation No. 3: Taking an average of relative mileage and relative reproduction cost as the allocation figure, a result of $86,-025,035 is obtained.

Calculation No. 4: Seeing that the stock and bond method, when averaged over a period of five years, is more favorable to validity than by using either a one or a three year period, I have made a calculation based on system value by the stock and bond method averaged over five years, taking the special master's figures for nonoperating property and using the relative mileage factor of allocation, and this gives a value to the property in Washington of $90,501,728.

Calculation No. 5: Taking the same method, but substituting relative reproduction cost as the allocation factor, a value of $99,-856,897 is found.

Calculation No. 6: Using for allocation an average of relative mileage and relative reproduction cost, a value of $95,164,649 is the result.

Now for some figures on the net earning method:

Calculation No. 7: Seeing that capitalization of earnings for a one-year period is more favorable to validity than when taking the average for either a three or a five year period, I have taken net earnings for one year capitalized at 6 per cent., and, using relative mileage as the allocation factor, find a value of $102,152,139.

Calculation No. 8: On the same basis, but using relative reproduction cost as the allocation factor, a value of $112,711,612 is ascertained.

Calculation No. 9: Using as the allocation factor an average of relative mileage and relative reproduction, a result of $107,-415,325 is obtained.

Calculation No. 10: Taking a combination of stock and bonds averaged over a three-year period and the capitalization of net operating income at 6 per cent. for the same number of years—the period most favorable to validity—and using relative mileage as the allocation factor, I find a value of $93,051,934.

Calculation No. 11: Using the relative reproduction allocation factor instead of relative mileage allocation, a value of $102,-670,773 is the result.

Calculation No. 12: Using for allocation an average of the relative mileage factor and the relative reproduction factor, a figure of $97,846,302 is arrived at.

Calculation No. 13: The system value of the operating property for 1925, arrived at by averaging together and giving equal weight to each method, of stock and bonds for one year, net earnings for one year at 6 per cent. and stipulated reproduction cost, is $345,888,513.

Calculation No. 14: Using the same methods for three years, instead of one year, the system value is $348,202,068.

Calculation No. 15: Taking the same methods for five years, the system value is $328,499,193.

Calculation No. 16: Since the three-year period is the most favorable to validity, we will use system value for that period for the purpose of our next calculation. Allocating this valuation to Washington on the relative mileage basis, a value of $107,455,158 is the result.

Calculation No. 17: Using relative reproduction exclusively for allocation purposes, a value of $118,562,804 is the result.

Calculation No. 18: Using for allocation an average of relative mileage and relative reproduction cost, the result is $112,991,571.

In making these calculations, the special master's figures for nonoperating property have been used wherever that factor is involved; his findings in that regard being more favorable to defendants than those made by any witness in the case, including Mr. Carey, the defendants' expert. I shall have more to say on the subject of nonoperating property later on.

I pass now to some illustrative calculations and comparisons for the purposes of the Northern Pacific assessment for 1926, using the same bases in most instances as those employed for 1925, but applying to them the figures for 1926.

Under calculation No. 1 the result is $91,-359,373.

Under calculation No. 2 the result is $98,-600,385.

Under calculation No. 3 the result is $94,-979,879.

Under calculation No. 4 the result is $92,123,876.

Under calculation No. 5 the result is $99,425,481.

Under calculation No. 6 the result is $95,774,678.

Under calculation No. 7 the result is $115,915,469.

Under calculation No. 8 the result is $125,102,761.

Under calculation No. 9 the result is $120,509,115.

Under calculation No. 10 the result is $95,501,779. (It should here be noted that for 1926 a one-year period is more favorable to validity than a three-year period, as in the case of 1925, but I wish to have the calculations for both years on the same basis.)

Under calculation No. 11 the result is $103,071,112.

Under calculation No. 12 the result is $99,286,446.

Under calculation No. 13 the result is $369,754,892.

Under calculation No. 14 the result is $352,421,045.

Under calculation No. 15 the result is $346,510,097.

Under calculation No. 16: Seeing that for 1926 the one-year period is more favorable to validity than either a three or a five-year period, in making this calculation for 1926 I will use the one-year period. Allocating this valuation to Washington on the relative mileage basis, the result is $115,696,306.

Calculation No. 17: Using relative reproduction cost exclusively for allocating the same value as used in calculation No. 16, the result is $124,866,227.

Calculation No. 18: Using for allocation an average of relative mileage and relative reproduction cost in allocating the same value, the result is $120,281,266.

It will, of course, be understood that by incorporating in this memorandum the foregoing calculations I do not mean to say, or to imply, that the taxing officials were at liberty to select the ones which give a result more nearly approximating the amount of the assessments under review. They have been put in for the purpose of demonstrating to what extremity one is driven in an effort to arrive at a valuation even approximating the amount of the assessments. Some of the calculations are made upon a basis which, if employed by the tax commission, would involve

the most palpable abuse of discretion, as well as the giving of weight to factors of value and of allocation which the law will not warrant or allow. A study of the calculations will make it plain that, wherever a figure is reached which even approximately approaches the amount of the assessments, either unwarranted weight is given to reproduction cost either as an item of base value or as a factor in allocation, which the law will not permit, or a peak year of earnings is arbitrarily chosen which palpably does not reflect average conditions over a reasonable period of time, or by the use of both methods in conjunction. It also must not be overlooked that wherever in the calculations a combination of stock and bonds, net earnings and reproduction cost is made, giving to each factor equal weight, that each of the first two factors reflects the value of the use of the property—the value of the utility—and therefore, when stock and bonds and net earnings are used in connection with reproduction cost in such circumstances, the practical effect is to give to the value of the use and to reproduction cost equal weight, instead of giving one-third weight to each factor, as might superficially appear to be the case. I am sure it will not be seriously argued that the commission used the single method as chosen in my calculation No. 8, that is, capitalization of net income for one year at 6 per cent., in arriving at a system value, and allocated this on the basis of relative cost of reproduction, when, in the face of an increase in valuation of less than $5,000,000 made by the commission in the year 1926 over the valuation made for the year 1925, it is shown by my calculation No. 8 that the valuation thus obtained would be an increase for 1926 of $12,391,149. Nor do I think it will be contended that the commission used, or might have used, the average of a combination made up of the stock and bonds averaged for three years, capitalization of net income averaged for three years at 6 per cent., and cost of reproduction new less depreciation, as shown by my calculation No. 16, in arriving at the valuation for 1925, and, because it was more favorable, used the average of a combination made up of the stock and bonds averaged for one year, capitalization of net income for one year at 6 per cent., and cost of reproduction new less depreciation, as shown by my second calculation No. 16, in arriving at a valuation for 1926. It is not even contended that in the use of either the stock and bond method or the net income method an unreasonably short period of time may be used or an arbitrary period be chosen which represents temporary or ab-

normal conditions. On the contrary, in the brief in behalf of King, Pierce, and Spokane counties, this language is found:

"The Master used a one year period for ascertaining the average market value, that is, the average selling price, of plaintiff's stock and bonds. Obviously the period is too short, and its use marks the confusion in the Master's mind between the value of plaintiff's property, the ultimate fact to be ascertained, and the value of its stock and bonds, which is only evidence bearing upon the ultimate fact. The revenue law of Washington requires an assessment of a railroad's property, not of its stock and bonds. If the stock and bonds were the subject of the assessment, doubtless a one year period, or even a shorter, would be proper, for the selling price of such securities fluctuates, violently, sometimes, from year to year, month to month, even day to day. But whether the bulls or the bears have control of the market, whether the selling price of a company's securities goes up or down, the substantial value which there is an old and great railroad, like plaintiff's, is not affected. There must be something of a permanent character, some substantial addition to or diminution of its physical property, some permanent increase or decrease in its earning power, to change the value. In sustaining reference to the selling price of a railroad company's stock and bonds in a valuation of its property, the courts speak of that price as evidence, as an indicia, as criteria, as a datum, bearing upon the value of the property. That price, however, is worthless as evidence unless it is averaged over a sufficiently long period to escape unreasoning fluctuations in the market, unreasoning in the sense that they are due solely to stock market causes and not to any change in the character of the property which they represent. The shortest period which the courts have ever considered proper is a five year period. In Chicago Union Traction Co. v. State Board [C. C.] 112 F. 607, 612–613, Judge Grosscup forcefully indicated the dangers of an inconsidered reference to the selling price of stock and bonds for valuation purposes, and the benefit to be derived from a proper consideration of it. Among other things he said: '* * * In the case of dividend paying stocks, the market quotations of capital stock, averaged for a reasonable period of time, say five years, and during normal business conditions, would afford a fair measure of value, and should be a strong consideration in fixing the same.' His views in that respect were adopted by Judge Cochran in

Louisville & N. R. Co. v. Coulter [C. C.] 131 F. 282, 304, who said that in order that reference to either the market value of the stock and bonds or the net earnings of a company should be a real aid to determining the fair cash value of its property, 'it is essential that it should cover a sufficient period to show the settled condition of things.'"

It is my opinion that these observations of the able and seasoned counsel who gave expression to them are sound, but, if they are permissible to be applied in criticism of the action of the special master, it is difficult to perceive how they are not equally applicable when measuring the conduct of the tax commission if it attempted to do precisely what the special master did. The special master, at page 90 of his report, states:

"Sheet 1 of Defendant's Exhibit 248 in this case, shows that beginning with 1911, its one hundred per cent tax valuation was fixed at approximately $126,000,000, and this valuation was carried on through the intervening years up to and including the year 1924. For 1925 it is practically the same figure. It is this valuation for 1925, $126,460,000, and for 1926, $131,200,000, of which the N. P. complains. There is no escape from the conclusion that the N. P. valuation as fixed by the Railroad Commission in 1910, was not only then adopted by the Tax Commission, but was carried forward from year to year until 1926, without any variation from the original figure except a very small one. It is hard to resist the conclusion that the Tax Commission simply carried forward, from year to year, this original valuation arbitrarily, and without any regard to the actual value of the property they had under consideration. It is incredible that in all these fifteen years, there was no fluctuation in the value of this enormous property. Everything else under the sun had fluctuated in value during these years, and if the N. P.'s operating property in Washington had not, it was the only thing in the universe that hadn't."

The facts as stated in these observations are correct, as shown by the record, and, accepting them as true, it is difficult to escape the conclusion which the special master draws.

I am not unmindful of the responsibility involved in interfering with the action of assessing and taxing officers, but I am convinced that these assessments ought not to be allowed to stand. The calculations I have set out demonstrate that under no use of any method or combination of methods which the law will countenance or tolerate can the values fixed by the tax commission in the North-

ern Pacific case be upheld. It has been suggested that the court is foreclosed against making the inquiry which has led to the finding of invalidity because the state of Washington does not specifically define a method of valuing railroad operating property, but neither does the statute define any specific method by which the general property of the state shall be assessed, yet under the Washington statute and similar statutes in other jurisdictions the books abound in cases where relief has been granted in respect of such property where valuations have been grossly excessive or have been arbitrary or capricious or made by the use of fundamentally wrong principles or methods. For example see the case of Weyerhaeuser Timber Company v. Pierce County, supra.

In the light of what I have said, and without further discussion, it is my conclusion that the values placed upon the Northern Pacific property, for both 1925 and 1926, were either arbitrary and capricious or were arrived at by the use of fundamentally wrong principles or methods. In addition, I am of the opinion that the assessments were so grossly excessive as to give rise to a presumption of constructive fraud. This will clearly appear, I think, when I come to place my valuations on the property.

Where an assessment is arbitrary or is made by the use of fundamentally erroneous principles or methods, the amount of overvaluation is not a controlling feature as a ground of equitable relief. It is only where constructive fraud is attempted to be shown by gross overvaluation alone that the amount of the excess becomes an important consideration in determining whether relief shall be granted. Weyerhaeuser Timber Company v. Pierce County, supra.

I shall now take up the controversies arising out of the cases of the Milwaukee Company. That company brought two suits, one relating to assessments made and taxes levied for 1926, and the other for 1927. Case No. E–4314 relates to 1926, and case No. E–4338 to 1927. In one important feature the two cases are not alike; in the 1926 case an attack is made on county ratios, while in the 1927 case such ratios are not assailed. In neither case is there any claim of an overvaluation of operating personal property.

As has heretofore been noted, the special master in these cases used exclusively the stock and bond method, averaging the market quotations over a period of one year; that is to say, for the 1926 assessment he took the

market quotations for the calendar year of 1925, and for the 1927 assessment the quotations for the calendar year of 1926. He did not include in his computation the months of January and February immediately preceding March 1 of the years, respectively, but, in view of the method which I shall pursue, this will not be important.

From March, 1925, to January, 1928, the Milwaukee Company was under foreclosure receivership, so it will be seen that during the periods selected by the special master for averaging the stock market quotations that receivership condition existed. In addition to what I have said concerning the stock and bond method of ascertaining value generally, the reliability of its exclusive use in the Milwaukee cases is further weakened because of conditions due to the receivership. But, as I am not pursuing the special master's course in the use of the stock and bond method, I shall not say more on this subject. I shall follow, in examining the Milwaukee assessments, the same methods which were pursued in the Northern Pacific case.

In the brief in behalf of King, Pierce, and Spokane counties, it is argued that there is not sufficient evidence in the record to show that any property of the Milwaukee Company is nonoperating property, and consequently that there is no basis upon which to make any deduction of such property from the system value found by the use of the stock and bond method. It is interesting to note, however, that these counties filed exceptions to the report of the special master upon the ground that, in making deductions of nonoperating property, his figures were too low; that is, he did not deduct enough. The more deducted for nonoperating property, the less there remains of operating property to be taxed, so, if the special master's deductions for nonoperating property were not large enough, this was in the defendants' favor in their efforts to uphold the assessments under examination. Counsel for Benton and other counties took an exception to the report upon the ground of insufficient evidence to warrant any deductions of nonoperating property, but in the brief in behalf of those counties no argument is advanced in support of the exception. So the situation is this: The counties that took no exception to the report in regard to nonoperating property excepting that the deductions were not large enough argue that no deductions at all should be made, and the counties that did take exceptions giving rise to such contention do not favor the court

with any argument on the point. However, I have examined the record with respect to nonoperating property, and am of the opinion that there was enough before the special master to warrant the making of deductions for property of that character. Seeing that the amount deducted by him was more favorable to the defendants than any other figures in the record dealing with the subject, for the purpose of my Milwaukee calculations I shall use the master's figures wherever nonoperating property is involved.

I have reserved until this time the making of a statement with regard to the cost of reproduction less depreciation of the properties of all the complainants, because I felt it could be more conveniently made when considering the Milwaukee cases. In making my calculations in the Northern Pacific case, wherever reproduction cost was used, I took the stipulated cost based upon the valuation report of the Interstate Commerce Commission showing the cost of reproduction as of 1914 plus depreciated additions and betterments made subsequent to the date of the respective valuation reports. Counsel for Benton county et al. insist that, because of the stipulation of counsel for the Milwaukee Company reproduction cost of its property was at least 82 per cent. greater than that amount, such cost must be calculated on the 82 per cent. increase basis. If the amount so arrived at is to be taken as the primary or base value of the property under the reproduction cost method, the value of the Milwaukee Company's property in the state of Washington in 1925 was $116,191,022, and in 1926 was $115,854,685. Yet, in the face of these facts, the assessments for 1926 and 1927 made by the state tax commission were, for each year, $50,100,000. An argument which leads to so ridiculous a situation as this is much better calculated to demonstrate the lack of evidential worth of reproduction cost as a factor in ascertaining market value for taxation than it is to induce the court to give greater weight and consideration to it.

By taking net operating income averaged over a reasonable period of time, and the market value of stock and bonds averaged over a like period, these factors reflecting actual results, it is at once seen that the benefits enjoyed by the Milwaukee Company in the operation of its property would not tolerate the giving to a reproduction cost of between $115,000,000 and $116,000,000 any considerable weight. As one magnifies the great disproportion between reproduction cost and actual results enjoyed in the use of the property, in that same proportion reproduction cost loses in weight as a factor in valuation. These observations are as applicable to the other complainants as they are to the Milwaukee Company.

In the Milwaukee cases, in allocating system value to the state of Washington, the special master used an allocation factor made up of the same elements as those employed in the Northern Pacific case, and gave to the factors the same relative weight. It appears, however, that in these cases, as in the Northern Pacific case, relative operated mileage is more favorable to validity than the factor used by the special master. In my Milwaukee calculations, therefore, I shall use the former factor.

Now some test and comparative figures shedding light on the Milwaukee Company's assessments. These calculations will be made on the same basis as those used in the Northern Pacific case, and will be referred to by number, such as calculation No. 1, etc. Wherever there are any differences in the computations, these will be noted.

First for the year 1926:

Under calculation No. 1 the result is $30,227,559.

Under calculation No. 2 the result is $39,332,649.

Under calculation No. 3 the result is $34,780,104.

Under calculation No. 4 the result is $33,256,612.

Under calculation No. 5 the result is $43,274,108.

Under calculation No. 6 the result is $38,265,360.

Under calculation No. 7: In this instance the most favorable period for capitalization of earnings is the three-year period, so that period is used, and the result is $28,100,084.

Under calculation No. 8, on the same basis, the result is $36,564,339.

Under calculation No. 9 the result is $32,332,212.

Under calculation No. 10 the result is $30,242,697.

Under calculation No. 11 the result is $39,352,346.

Under calculation No. 12 the result is $34,797,521.

Under calculation No. 13 the result is $404,501,284.

Under calculation No. 14 the result is $422,452,602.

Under calculation No. 15 the result is $404,623,672.

Under calculation No. 16 the result is $38,147,470.

Under calculation No. 17 the result is $49,638,181.

Under calculation No. 18 the result is $43,892,825.

The following are the same calculations for the year 1927:

Under calculation No. 1 the result is $31,474,060.

Under calculation No. 2 the result is $40,545,792.

Under calculation No. 3 the result is $36,009,926.

Under calculation No. 4 the result is $32,725,940.

Under calculation No. 5 the result is $42,158,500.

Under calculation No. 6 the result is $37,442,220.

Under calculation No. 7 for a one year period the result is $27,868,324.

Under calculation No. 8 the result is $35,900,778.

Under calculation No. 9 the result is $31,884,551.

Under calculation No. 10 I am using a one-year period instead of a three-year period, the former being more favorable to validity, and the result is $29,671,192.

Under calculation No. 11, on the same basis, the result is $38,223,285.

Under calculation No. 12 the result is $33,947,238.

Under calculation No. 13 the result is $416,779,900.

Under calculation No. 14 the result is $414,103,674.

Under calculation No. 15 the result is $416,612,774.

Under calculation No. 16 the value on the one-year period basis is more favorable to validity, so valuation for that period is used, and the result is $37,885,293.

Under calculation No. 17 the result is $48,804,926.

Under calculation No. 18 the result is $43,345,110.

■ It would be unpardonable to load this memorandum with additional figures and calculations. I have incorporated the forego-ing, as I have said, for the purposes of illustration, and as showing in a practical way the method of approach which I have pursued in an effort to test the validity of the challenged assessments. It makes no difference what reasonable method is used, the result inevitably leads to the conclusion that the valuations placed by the tax commission on the Milwaukee properties for both years must have been made either by the use of fundamentally erroneous principles, or by the adoption of legally unwarranted methods, or by the exercise of an arbitrary, capricious, and unreasonable discretion. Moreover, the valuations, when measured by any standard which is at all permissible, are so grossly excessive as to give rise to the presumption of fraud in law. This will more clearly appear when comparison is made between the values which I shall place upon these properties and the amount of the offending assessments. It is, of course, conceded that in assessing property for taxation much must be left to the judgment, knowledge, and discretion of the assessing officials, but surely this does not justify the resort to palpably unreasonable and unjust methods, for by the statute of Washington defining the duties of the tax commission it is enjoined in mandatory terms to make a substantially just and correct determination.

If it is thought that the methods which I have employed in testing the assessments in question are cumbersome and awkward, my answer is that no other course was open to me, due to the voluntary silence of the assessing officers. I am convinced, however, that the results obtained by the methods I have used are dependable, and surely they have been generous toward the assessments and the officials who made them.

I wonder what the defendants would think if, when I come to placing values upon the properties for the purpose of determining the amount of relief to be granted, I should merely set down the figures and neither state nor intimate anything indicating the method by which my conclusions had been arrived at, particularly so if the defendants, considering themselves aggrieved by my determinations, sought to have them reviewed on appeal. If this thought is pondered, perhaps the circuitous path I have traveled will more readily be understood.

■ My next task is to consider the case of the Spokane Portland & Seattle Company, involving the assessment for the year 1926. At the outstart, it will be apparent from my discussion in the Northern Pacific case that

I shall reject the super-system method of dealing with the assessment of the Spokane, Portland & Seattle Company's property, and I shall not in this connection further labor that point. As the stock and bonds of the Spokane, Portland & Seattle Company are owned entirely by the Northern Pacific Company and the Great Northern Company, each owning a one-half interest therein, and are not bought and sold on the stock exchange, it was not possible for the special master, and it will not be for me, to make any use of the stock and bond method. The special master, in dealing with the Spokane, Portland & Seattle assessment, used a capitalization of net operating income, taking 7 per cent. as the capitalization rate, and a one-year period of operating net earnings. In this connection it seems convenient to say that, in adopting 7 per cent. as the rate of capitalization, I think the special master was in error. I find no evidence in the record which would warrant its use. The scholarly Dr. Hadley, in his tables and calculations, used a 6 per cent. figure, and two of complainants' own witnesses support that percentage. Nor am I impressed with the argument advanced by counsel for the Northern Pacific Company in its case that, by using 6 per cent. as the rate of capitalization, one must assume that the entire earnings of the company are to be declared in dividends. The use of such a method does not necessarily call for any consideration of what the company may do with its earnings. It is patent that, if the full amount is not used for declaring dividends, the residue remains in the treasury of the corporation for any proper corporate use. Furthermore, the original transportation act, in determining a fair rate of return for interstate railroads, did not employ so high a figure, and in none of the subsequent percentages fixed by the Interstate Commerce Commission has a figure in excess of 6 per cent. been employed. And the commission under the transportation act fixes rates which are found to be sufficient for all purposes, including the attraction of necessary capital for carrying on railroad operations. For the purpose of my study of the Spokane, Portland & Seattle assessment, I have used a capitalization rate of 6 per cent.

I also feel that net operating income spread over a much longer period is vastly better designed to reflect true earning capacity, and therefore evidence market value, than is a calculation confined to a one-year period. This is amply demonstrated by the testimony of Dr. Hadley. By using a longer period, violent fluctuations due to temporary or abnormal causes are smoothed out, the peaks are leveled, and the depressions are filled in. The special master seems to have proceeded upon the thought that, since assessments of railroad operating property are to be made annually, the net earnings should be considered annually, that is to say, to take the year next preceding the assessment year, for the determination of assessable value. This course of reasoning, however, is not impressive. Let it not be forgotten that, whether property is assessed annually or at some other stated period, market value of the property is the thing sought, and, if a longer period of net earnings is employed year by year, the net result is to drop off the most remote year for the preceding assessment and substitute in its stead the new year next preceding the assessment date. By this plan market value is more likely to be ascertained in a reliable and trustworthy manner.

It has been vigorously pressed upon me that, due to the joint ownership by the Northern Pacific Company and the Great Northern Company of the stock and bonds of the Spokane, Portland & Seattle Company, the net operating income of the latter company does not, or at least may not, show the true earning capacity of the Spokane, Portland & Seattle Company's property. That is to say, that the parent companies use it rather to further their own interests, respectively, than to promote the interests of the Spokane, Portland & Seattle Company considered as a separate entity. Whilst the evidence in the record tending to show that any such practice as this has in fact been resorted to is not very convincing, in my consideration of the Spokane, Portland & Seattle case I have kept the thought constantly in mind. Offsetting the contention that the Spokane, Portland & Seattle earnings may not accurately reflect its true earning capacity, it is argued that the selfish interests of the two parent companies, each clamoring for that which properly belongs to it, would tend to render it extremely improbable that the Spokane, Portland & Seattle properties have been improperly used by the parent companies; that the selfish interests of the one would check and balance the selfish interests of the other. This also is worthy of consideration.

In allocating system base value to Washington, the special master used the same elements of allocation as those employed in the Northern Pacific and Milwaukee cases. It should here be noted, however, that his factor

of allocation in the Spokane, Portland & Seattle case is larger than that contended for by the defendants, but smaller than that contended for by the complainant. Also it is larger than relative operated mileage allocation.

The complainant does not take any exception to the allocation factor used by the special master. Counsel for Benton and other counties except upon the ground that system value should be allocated to Washington on the basis of relative reproduction cost, instead of using the special master's figure. It appears, however, that the special master's allocation is more favorable to the defendants than is the one for which they contend, and this is true no matter whether the one, three, or five year period is adopted. I imagine the exception was taken as a matter of consistency rather than for the purpose of inducing the court to sustain it. For like reasons of consistency on my part, I shall not do counsel the injustice of agreeing with him. I shall use the special master's allocation figures in my calculations.

At this point I shall incorporate a few figures which will, I think, shed considerable light upon the validity of the Spokane, Portland & Seattle assessment and the manner in which it was made.

The net operating income of the company capitalized at 6 per cent. for one year is $29,550,783; for a three-year period is $31,643,083; and for a five-year period is $30,103,367. All these figures reflect system base value. Seeing that the three-year period is more favorable to validity, I have taken net earnings for that period, and, using the special master's allocation factor, a value to the state of Washington of $25,042,336 is found. Taking net operating income capitalized at 6 per cent. for three years, and cost of reproduction, and giving equal weight to each in arriving at system value, and using the special master's allocation factor, a value to the state of Washington of $35,115,-247 is reached. Counsel for King, Pierce, and Spokane counties insist that, when such a method is used, the result obtained so closely approximates the value of the property as fixed by the tax commission that the difference can easily be accounted for in the leeway arising out of the discretion of the assessing officials. I think this argument is more plausible than sound. Of course, so small a difference would not justify disturbing the assessment, if a permissible method had been used in ascertaining it, but the vice of the contention lies in the method by which the difference is arrived at. Surely, in the face of actual results, it will not be contended that reproduction cost should be given equal weight with operating net income in this case. The use of such a method would involve nothing short of oppression. Such an arbitrary combination of factors would involve palpable abuse of discretion, or the utter lack of the use of discretion, and would have nothing substantial on which to rest. Relevant factors of value must be used in the exercise of judgment—not merely by striking averages—and the facts of the particular case must be given reasonable consideration. As said in McCardle v. Indianapolis Co., 272 U. S. 400, 410, 47 S. Ct. 144, 148, 71 L. Ed. 316: "The decision of this court in Smyth v. Ames, 169 U. S. 466, 547, 18 S. Ct. 418, 434 (42 L. Ed. 819), declares that to ascertain value 'the present as compared with the original cost of construction' are, among other things, matters for consideration. But this does not mean that the original cost or the present cost or some figure arbitrarily chosen between these two is to be taken as the measure. The weight to be given to such cost figures and other items or classes of evidence is to be determined in the light of the facts of the case in hand."

Neither will it do for one to take as much as can be found by the use of factors of recognized primary importance, and then, because reproduction cost is not equaled or exceeded, make up the deficit by drawing on such cost—a factor of secondary consideration—for the amount of the shortage. As well use reproduction cost in the first place.

Allocating the base value we have just been considering on the basis of relative reproduction cost, the result is $32,852,324, and, using relative operated mileage for allocation, the result is $32,763,582. Granting that the tax commission had the right to take into consideration the fact of the physical connections between the Spokane, Portland & Seattle and the Northern Pacific and the Great Northern, and also the fact of the joint ownership by the latter two companies of the Spokane, Portland & Seattle Company's stock and bonds, and add on an additional amount because of these conditions, will it be contended, in the light of the evidence before the court in this case, that they could fix this amount at $10,527,318—the difference between the value found by the use of the most favorable method of computing net operating income allocated on the most favorable basis, $25,472,682 and $36,000,000 the amount of the assessment? Especially so when a similar addition, and for precise-

ly the same reason, could also be made in assessing the properties of the Northern Pacific Company and the Great Northern Company. Too much importance must not be given the fact of these physical connections when this advantage must necessarily be reflected, in some considerable measure at least, in the net earnings of all the companies concerned. Would it not be vastly more reasonable, would it not reflect a more legitimate exercise of reasonable discretion, to take net operating income capitalized at 6 per cent. for three years, allocated to Washington by the use of the special master's allocation figure, for 75 per cent. of the total assessment, and take reproduction cost allocated by the use of the same factor for the remaining 25 per cent? A valuation so worked out would be $30,078,791. In this way we still fall short of the assessment in the amount of $5,921,209, an excess of overvaluation of 19.68 plus per cent.

For lack of available material, and because we are dealing in smaller figures, the overvaluation of the Spokane, Portland & Seattle property cannot be made to stand out so conspicuously as I think it does in the cases of the Northern Pacific Company and the Milwaukee Company, yet I am convinced that upon careful analysis the same vice is to be found in the case of the Spokane, Portland & Seattle as was discovered in the other cases.

No claim is made that in operating the Spokane, Portland & Seattle Company there has been any lack of competency on the part of its officials, or lack of economical methods in operating the road. The only thing that militates against proper operation rests largely in an inference drawn from the joint ownership of the property by the parent companies. There is little in the evidence to show that there has in fact been any such manipulation as the inference suggests. When it is seen, by examining the net income of the company averaged over a period of five years, that to sustain the valuation placed upon its property by the tax commission would reduce it to an earning of approximately 3.70 per cent., yet in the very calculations we are using 6 per cent. is employed for capitalization purposes, some light is shed on the validity of the action of the state assessing officials.

For the same reasons assigned in the cases of the Northern Pacific Company and the Milwaukee Company, and without repeating the language, I conclude that the Spokane, Portland & Seattle assessment cannot be allowed to stand.

Having concluded that the assessments in question cannot be sustained, and in virtue of the maxim, "He who seeks equity must do equity," the logical next step seems to be for the court to place a valuation upon the properties of the companies respectively, in order to determine the amount of relief to be granted. Happily, in the discharge of this duty, I am in a somewhat broader field, in that I am not hampered by the restrictions which the law places about me in reviewing the actions of assessing and taxing officials. In valuing the property myself, I have more freedom of choice in selecting and appraising relevant factors of value and in the adoption of methods which, in my judgment, are the best calculated to reflect reliable and trustworthy results.

From what has been said earlier in this memorandum, I think it appears, inferentially at least, what I consider the best method to be pursued in valuing railway property for taxation. I feel that in both reason and authority it is infinitely safer, where a number of relevant evidential factors of value are available, to take a composite view based upon all relevant elements and give to each in the exercise of sound judgment that weight and consideration which the peculiar facts of the case in hand justify and require. By using in combination a number of factors, each evidential element serves as a check and balance upon the others, or at least upon some of the others. It is obvious that there is no perfect method of valuing a vast railroad property either for rate making or taxation. The most that can be hoped for is to reach a determination which is approximately just and correct. It is my opinion, predicated, I am sure, upon the overwhelming weight of authority and sustained in reason, that the stock and bond method and the capitalization of net earnings when averaged over a reasonable period of time and taking care to avoid the encountering of unusual or abnormal conditions, and in the case of net earnings using a reasonable rate for capitalization, are factors of primary importance in determining the value of the utility of a railroad for taxation purposes where no question of competent or economical management is involved. Whilst neither method is ideal, both are designed to lead to correct conclusions if applied with due circumspection and not slavishly embraced. Original cost and cost of reproduction less depreciation, where other and more reliable criteria of value are available, are factors of secondary usefulness in valuing property for taxation purposes, as distinguished from ascertaining a special

value for rate-making purposes. I have endeavored heretofore to point out the reason for the difference in worth of these factors in the two fields just mentioned. Reproduction cost is useful in many situations, and sometimes, because of the necessities of the case, its use as a factor of primary value is altogether permissible. It must not, however, in valuing property for taxation, be magnified to the point where the result reached is out of reasonable proportion and balance to the actual benefits enjoyed by the owners of the property which is dedicated to the public service. Its use in the field of ascertaining value for taxation must be a careful and well-considered use, and the facts of the case in hand must ever be kept in the foreground, lest it play a part or exert an influence out of all reasonable proportion to its relevancy to the question.

Without further elaboration of permissible factors, or the relative weight to be given each, and in view of what has been said already upon the subject in dealing with the validity of the assessments, I feel that it is sufficient for the present purpose to say that, in valuing the properties of the Northern Pacific Company and of the Milwaukee Company, I shall use a composite made up of stocks and bonds, operating net income and reproduction cost, earnestly endeavoring to give each factor due and reasonable consideration in the light of the facts. In the case of the Spokane, Portland & Seattle Company, because of the situation arising out of the joint ownership of its securities by parent companies and that there are no available market quotations for its stock and bonds, I shall give consideration to operating net income and cost of reproduction, giving to each factor that weight, and that weight only, which I feel will fairly and justly reveal the value of the property in the light of the situation which it occupies with respect to the Northern Pacific Company and the Great Northern Company. Wherever reproduction cost is taken into consideration, I have used the figures based upon the extended and supplemented valuation report of the Interstate Commerce Commission, because I feel that these figures are quite reliable and trustworthy, and lend themselves to practical application much better than any other figures found in the record relating to the subject. If criticism be made of using such figures, instead of figures arrived at by taking a large percentage of increase, for example, 82 per cent. in the Milwaukee cases and 125 per cent. in the Northern Pacific case, my answer is that, if an amount arrived at by this latter method must be accepted as reproduction cost, then I should be compelled, in equity and good conscience, to make a corresponding reduction in the percentage of influence which that element of value is to be given.

Using the foregoing method for the purpose of ascertaining system base value, the next thing to be determined is what factor of allocation shall be employed in order to apportion to the state of Washington its just part of such value. In dealing with the case of Wallace v. Hines, supra, I called attention that in that case relative main line mileage, as distinguished from relative operated track mileage, was involved, and the distinction between the two is of no small importance. It is plain that relative main line mileage does not take into account the operated track mileage incident to large terminal operations, but operated track mileage does take into consideration and give weight to terminals in exact proportion to the mileage of operated track in each. Where a large terminal contains, as it necessarily must, a large proportional mileage of yard, switching, and industry tracks, this extra mileage is reflected in the operated track mileage factor. In dealing with the subject of allocation, one must be careful not to fall into the thought that terminal property must be valued as a distinct and separate entity rather than be treated as a part of the system to which it belongs, in order to give to the state in which such property is located the full benefit to which it is entitled. The terminal property being treated as a part of the system, any method of allocation which fairly and reasonably reflects the local benefits arising out of terminal property and facilities is all that is required. It is my opinion that under ordinary circumstances, where a railroad system is homogeneous, that allocation on the basis of relative operated track mileage is as fair a method of allocation as the nature of the situation will allow, and it certainly possesses the virtue of exactness. I feel supported in this conclusion by the repeated approval which this method has received at the hands of the Supreme Court of the United States. Furthermore, the state of Washington has, by statutory enactment, announced a decided preference for it. The Legislature of that state directs the tax commission to take into consideration the entire mileage of the system and the part thereof within the state, and, in allocating to the counties the assessable and taxable value of the property in the state, it directs the use of relative mileage allocation exclusively.

In view of the principle laid down in Wal-

lace v. Hines, supra, as well as in Pittsburgh, etc., Railway Co. v. Backus, supra, I feel that it is proper in this case to take into consideration the fact that Washington is one of the Northern Pacific Company's terminal states, and that it has within its borders extensive terminal properties. In doing this, however, I shall not treat the terminals as a separate and distinct entity dissociated from the remainder of the system.

In arriving at permissible factors for allocating system value, haphazard and reckless averages cannot be struck, for a very small percentage of difference in allocation produces large results when it is applied to a system value running into the hundreds of millions. Relative operated track mileage, as I have said, does take into consideration terminal properties in proportion to the mileage of terminal trackage in the state to that same character of mileage outside the state, but it may not, under all conditions, give full expression to the local value existing in the state where terminals are located. After pondering the question thoughtfully, I have decided to use a composite factor of allocation, made up by giving two-thirds weight to relative operated track mileage and one-third weight to relative reproduction cost. When it is seen that under relative cost of reproduction more than one-third of the entire system value of the Northern Pacific Company is in the state of Washington, it becomes at once apparent that this is not due entirely to the existence of terminal properties in that state. The company has large and expensive terminal facilities at the eastern end of its road. It seems plain that the reason for this rather startling result is to be found in major part in the fact that the Northern Pacific road in the state of Washington had to be constructed over rugged and mountainous country, which, while greatly increasing the cost of construction, does not necessarily increase the value of the utility of the property. These are some of the considerations which have induced me to give to the two factors of allocation the influence which I have assigned to them respectively. By the use of this method, a factor of allocation of 31.92 is arrived at.

It will of course be appreciated that it is not humanly possible to determine the local value to the state of Washington arising out of the terminal properties therein, considering them as a part of the system, with anything more than approximate correctness.

In testing the validity of the assessment of the Spokane, Portland & Seattle property, I made use of the special master's allocation factor because it was more favorable to the defendants in their effort to uphold the assessments. It is true that I find in the record no exception by the complainant to the allocation factor used by the special master, but this factor is made up of elements which change with the years to which they are applied. I have departed so radically from the method used by the special master in valuing the Spokane, Portland & Seattle property that I do not feel justified in holding the company to the mere elements comprising the special master's factor simply because it did not except to the one-year factor itself. I shall therefore use relative operated track mileage in allocating system value to the state in the Spokane, Portland & Seattle case. There are in this case no exceptional conditions militating against its use. The figure is 73.84 per cent.

I shall now take up the Northern Pacific valuations. In using both the stock and bond method and the capitalization of net operating income method, I have chosen a three-year period. The reason for this choice is that I feel it is advisable not to include the years which reflected the disturbed conditions following as an aftermath of the World War, and the confusions and dislocations immediately following the termination of federal control of railroads. First the valuation for 1925.

The corporate system value arrived at by the stock and bond method averaged over a period of three years, exclusive of "B" and "C" bonds, is $330,469,358. From this amount must be deducted the value of the nonoperating property of the company. In determining the amount of such property, some controversy has arisen, and I shall dispose of these questions at this point. Counsel for the company insist that it should have deducted as nonoperating property the excess in value of its Burlington stock over the value of the "B" and "C" bonds. In their brief, however, I find this language: "The Burlington stock and Northern Pacific bonds of Series B and C may be treated in either of two ways: 1st, Series B and C bonds may be excluded from the funded debt of Northern Pacific; 2nd, or they may be included and the Burlington stock deducted. Plaintiff, in its showing to the tax commission, has adopted the first alternative. As the value of the stock is substantially in excess of the bonds * * * our method is in defendants' interest. * * * Plaintiff, as already said, has adopted the alternative most favorable to

defendants in excluding the bonds and making no deduction for the stock. Plaintiff has always pursued this course in its dealings with the state tax commission, and no objection has ever been made."

If the uniform and habitual method of dealing with these stocks and bonds has been to exclude the "B" and "C" bonds from the funded debt of the Northern Pacific Company, and this has gone on without objection or question over a long period of years, I see no reason for departing from it now. The "B" and "C" bonds will be eliminated, and no excess in stock over bond value will be allowed as an item of nonoperating property.

The special master, in his table of deductible nonoperating property, placed a value of $11,000,000 on the company's land grant lands. I find nothing in the record disclosing how he arrived at this sum. The lands were valued by the Interstate Commerce Commission as of June 30, 1917, at $21,000,000, but since this valuation it appears that some of this land had been sold. Making deduction for these sales, it is shown that the amount remaining at the time of the assessment was $19,677,571. I regard this as the most dependable evidence in the case with respect to the value of the land grant lands. This value will be used in deducting nonoperating property.

■ The item for "lands held for future operating use but locally assessed" cannot be so deducted, for the simple reason that it is not nonoperating property, and the fact that it is locally assessed does not change its character. This is not the time or place to get relief from double assessment in this respect, if there be any such involved.

■ The item "Northwestern Improvement Company $16,600,000" is based on the company's own testimony, and it cannot be heard to complain of this amount. What has already been said earlier in this memorandum disposes of the remaining items of nonoperating property. I find the proper amount to be deducted is $49,488,871, and this sum will be used for both 1925 and 1926. Deducting nonoperating property from the entire system value under the stock and bond method, there remains operating property in the amount of $280,980,487.

■ The value of the system under the net operating income method, averaged over a three-year period and capitalized at 6 per cent., is $313,400,817.

The value of the system on the basis of cost of reproduction, as shown by the extended and supplemented valuation report of the Interstate Commerce Commission, is $441,547,329.

If it were not for the considerations which I am about to state, I feel that a system valuation made up by giving 50 per cent. weight to each of stock and bond value and net operating income value would be sufficient, and the matter might very well be left to rest there. I feel, however, that there is merit in the argument that neither the stock and bond method nor the net income method reflects the full value of the utility of the property. Stock and bonds may do so in theory, but it is plain, under the facts of this case, that that method has not taken the future of the property into account. Patently the net income method shows the value of the use of the property based on past experience solely. It establishes the value of the past use of the property, but it may not adequately reflect the value of the utility itself. It is true the Northern Pacific is the oldest transcontinental railroad, well constructed, competently directed, and running through a highly developed territory. Yet its facilities are capable of a much higher degree of service than they have yet been called upon to perform. It is plain that the construction of the road has been made with a forward-looking policy in mind. Consideration has been given to the future in its construction, and provision has been made in advance to take care of future demands. This fact surely would have influence in the mind of the theoretical purchaser of the property. He would know that, in the march of progress, if greater demands were made upon the property, the facilities would be ready at hand, and would not have to be thereafter constructed. It is an extremely difficult task to penetrate the thick veil of futurity, and to weigh with very much accuracy occurrences and conditions which have not yet transpired or developed. Nevertheless, I am convinced that there is an element of value in the Northern Pacific property which is not fully reflected in a combined use of the stock and bond method and the net income method. In the case of the Northern Pacific Company, it has been seen that the system value ascertained by the use of capitalizing net income is substantially higher than the value found by the stock and bond method. In combining these values, the average is struck at the expense of net income value. Consequently the state is not given full benefit of the value of the property which its past history alone would justify. Therefore, having available the secondary factor of value, reproduction

cost, and for the want of any better method, I have made limited use of that element, for the purpose of making up for the shortcomings of the primary factors. If, with an eye to the future, the road has been constructed so as to be equal to giving a greater service than it has yet been called upon to perform, this is so because of the manner and character of its construction, which may, for practical purposes, be somewhat reflected in reproduction cost, provided this factor is checked by comparison with actual results and be not allowed to run wild. Instead, therefore, of giving 50 per cent. weight each to the stock and bond method and to the net earning method, I have, after making many comparisons and careful studies, concluded to give to each of these factors 40 per cent. consideration in arriving at system value, and to reproduction cost 20 per cent. weight. Whilst the disproportion in these percentages may appear to be large, the taking of 20 per cent. of cost of reproduction is productive of no mean or inconsequential results. Its use on the 20 per cent. basis adds to the value of the system the sum of $28,871,336, which, when allocated to the state of Washington, amounts to $9,215,730, yet without unduly or unreasonably adding to the value of the utility of the property as reflected by its past history of earnings.

I have endeavored to give reasonable weight to all relevant facts and factors. I cannot make pictures of my mental processes and hang them on the wall. I am merely trying to point out, for the benefit of counsel and litigants, in a general way, the methods I have employed and some of the reasons which lead me to their adoption.

In the application of the method which I have attempted to describe, I find that, by taking 40 per cent. of stock and bond value averaged over three years, the sum of $112,-392,195 is the result. By taking the same percentage of capitalized net income averaged over the same period of time, I get $125,360,327. By taking 20 per cent. of reproduction cost, the result is $88,309,466. The sum of these three results gives a grand total of system value of $326,061,988. Allocating this value to the state of Washington by the use of the factor I have already stated, 31.92, the part of system value which should have been assessed in Washington is $104,-078,987. For this year the property was assessed by the tax commission at $126,460,-000, or an overvaluation in amount of $22,-381,013, or a percentage of overvaluation of 21.50.

I now pass to the valuation for 1926.

Using the same methods and elements in arriving at the value for this year as were used for 1925, the following results are obtained: Using stock and bond value averaged over a three-year period, and deducting the same amount for nonoperating property as was used in 1925, the result is a system value of $272,924,951. Using net operating income capitalized at 6 per cent. averaged over a period of three years, the system value is $328,827,517. The Interstate Commerce Commission valuation, supplemented and brought down to date of assessment, shows a system value of $446,833,095. Applying the same percentages of weight to these elements as set out for the year 1925, that is, using 40 per cent. of the result obtained by the stock and bond method, we get a figure of $109,169,980; applying 40 per cent. to the system value found by capitalized net operating income method, we get a figure of $131,531,007; applying 20 per cent. to cost of reproduction system value, we get $89,366,619; combining these figures gives a total system value of $330,067,606. Using the same method in arriving at an allocation factor as was used for the year 1925, we get a factor of 32.12 to use for allocating system value to the state of Washington. Applying this allocation factor to the system value found results in a valuation to the state of Washington in the sum of $106,017,-715, as compared with the assessed valuation of $131,200,000, or an overvaluation for the year 1926 of $25,182,285, or a percentage of overvaluation of 23.75.

In the Northern Pacific cases no question is raised as to the segregation of the assessed value into real property and personal property. In making a segregation under the valuations which I have placed upon the property, therefore, the same ratio can be employed as that used by the tax commission in segregating its assessments. So much for Northern Pacific valuations.

Next come the Milwaukee valuations. I have already noticed the state of the record with respect to the defendants' exceptions to the report of the special master in determining the amount of deductible nonoperating property in the Milwaukee cases, and have disposed of such exceptions. Counsel for the company, however, contend that the master's deductions are too small, and insist that they should have been ascertained by apportioning the total system value of operating and nonoperating properties between the two classes in the proportion which the net

revenue from each bears to the total net revenue. It must be conceded that this insistence is not without merit. It is admitted, however, that the method of capitalizing the net income from the nonoperating property is a proper method of ascertaining the value of nonoperating property and that it is supported in authority. It is evident that the special master pursued the latter course. He deducted $19,000,000. The exact figure, however, for 1926 is $19,348,653, and for 1927 $19,001,619. In ascertaining this amount, he took the net income from the nonoperating property for a period of one year and capitalized it at 6 per cent. It is contended that a longer period of averaging the net income should have been used. The additional amount contended for is not an item of any great consequence after system value has been allocated to the state. This is especially so under the method which I am using. In view of the record with regard to nonoperating property in the Milwaukee cases, I do not feel justified in disturbing the action of the special master in this respect, and the figures I have stated will be used in deducting nonoperating property.

■ For the purposes of the 1926 valuation by the use of the stock and bond method averaged over a period of three years, and deducting the amount just stated for nonoperating property, the system value of the Milwaukee Company's operating property is $358,292,648. By the use of capitalization of net income at 6 per cent. averaged over the same period of three years, the system value is $311,185,867. The cost of reproduction, as shown by the extended and supplemented valuation report of the Interstate Commerce Commission, is $597,530,638. In taking a three-year period for applying the stock and bond method and the net income method, two years are included which were prior to the year of the receivership proceedings, and of course could not have been influenced by the receivership. It is no valid criticism to say that they reflect the conditions which ultimately resulted in receivership and reorganization. They were the actual conditions existing at the time, and I see no reason for discounting them.

■ Much argument has been advanced by counsel for Benton and other counties challenging the competency of the management and operation of the Milwaukee properties prior to the receivership, and some objection is made that certain improper items were charged as operating expenses during the receivership period. I have given careful thought to these contentions, but I cannot, without extending this memorandum into a tome, enter upon a detailed discussion of the many items involved in these criticisms. When they are summed up and weight given them, as contended for, the amounts, when allocated to the state of Washington, are not large. Neither shall I attempt to follow counsel into the field of determining what the property was worth in 1926 by examining what the reorganized company accomplished after it took charge of the property and prior to the closing of the taking of testimony in these cases—a period of approximately eight months. Of course, no such condition could possibly have been before the tax commission in making its assessments, and I feel the period of time suggested is too short and too remote to be of any considerable worth in arriving at a just determination of the value of the property in 1926. Furthermore, it is not the task of the court to determine valuations under a reorganized plan which did not become effective until two years following the time when the assessment under review was made. It is true that in the operation of the Milwaukee Company, prior to receivership, economies in cost of operation might well have been effected, and no doubt would have been, but for lack of funds. This situation will be covered presently.

■ It will be observed that during the three-year period made up of 1923, 1924, and 1925, the years adopted for averaging stock and bonds and net income for fixing the 1926 valuation, the stock and bond method reflected a larger valuation of the property of the company than did the net income method. I shall not pause to consider what brought about this situation. I call attention to the fact because the exact opposite of this situation existed in the Northern Pacific case. In that case I gave equal weight to stock and bond value and to net income value, and I see no reason why any different course should be followed in the Milwaukee cases.

■ With respect to the factor of allocation to be employed in setting off to Washington its share of system value, the conditions in the Milwaukee cases are by no means identical with those with which we dealt in the Northern Pacific case. The Milwaukee Company has extensive terminals in Chicago, Milwaukee, St. Paul, Minneapolis, Butte, Council Bluffs, Kansas City, and perhaps at a number of other important points on the eastern portion of its line. In using operated track mileage for allocation in the Milwaukee

cases, a similar terminal contention to that advanced in the Northern Pacific case is thought to be without merit. As I have already pointed out, under the relative operated track mileage allocation method, the mileage incident to terminals is taken into consideration in exact proportion to the mileage of operated track in each state. I do not think this will be denied. In addition, the Milwaukee Company operates 16,358.61 miles of railroad, of which 1,476.97 miles are in the state of Washington, whilst the Northern Pacific Company in 1926 operated a total of 10,362.12 miles of railroad, of which 3,242.02 miles are in the state of Washington. When relative operated track mileage is used in the Milwaukee cases, it gives to each mile of trackage in the state of Washington equal value to each mile of its road in its highly developed centers of population in the East, where its large and extensive operations are conducted. Surely, in these circumstances, there is no such lack of homogeneity in the road as to call for the application of the exception rule discussed in the Backus Case; surely not from the standpoint of the defendants. I have graver doubts as to whether, by using relative mileage allocation in the Milwaukee cases, property of the company is not brought into the state for taxation therein, as discussed in Wallace v. Hines, supra. After mature deliberation, I have concluded that it will perhaps work no injustice either way if relative operated mileage is adopted as the factor of allocation. That method gives a figure of 9.03. The master's composite allocation factor was 7.17.

The Milwaukee Company's railroad throughout is confessedly of excellent construction, and is equal to a service vastly greater than any it has yet been called upon to perform. The western extension from Mobridge to the Sound is of comparatively recent construction, and naturally passes through a territory which is not yet highly developed. As in the case of the Northern Pacific Company, I am convinced that there is in the Milwaukee Company's property an element of substantial value which is not fully reflected by the stock and bond method or the net income method or by taking the two together. I feel also that in 1926 there was room for improvement in the operation methods employed by the company. It seems reasonably certain that substantial economies, assuming the availability of funds for putting them into effect, might easily have been adopted. This would result in producing a larger net operating income valuation of the property. For these and many other reasons not necessary to state, I feel that there is a proper place for the use of reproduction cost in arriving at the Milwaukee valuations. After making innumerable comparisons and examinations, I am induced to conclude that by taking 40 per cent. each of stock and bond valuation and net income valuation, and looking to reproduction cost for the remaining twenty per cent., a reasonably fair and just determination will be arrived at. By using 20 per cent. of reproduction cost value, there is added to the value of the entire system $52,558,277, which, when allocated to the state of Washington, results in increasing the valuation in that state $4,746,012. In the application of the method just stated, I find that by taking 40 per cent. of stock and bond value averaged over three years the sum of $143,317,059 is the result. By taking the same percentage of capitalized net income averaged over the same period of time, I get $124,474,347. By taking 20 per cent. of reproduction cost, the result is $119,506,128. The sum of these three results gives a grand total of system value of $387,297,534. Allocating this value to the state of Washington by the use of the factor already stated, 9.03, the part of system value which should have been assessed in Washington is $34,972,967. For the year 1926, the Milwaukee property was assessed by the tax commission at $50,-100,000, or an overvaluation in amount of $15,127,033, or a percentage of overvaluation of 43.25.

In making the valuation for 1926, I pointed out my reasons for using a three-year period over which to average the market value of stock and bonds and capitalized net earnings. For 1927 it will be possible to adopt a four-year period and still keep away from the abnormal conditions following the termination of federal control and also to include two years of operations which occurred prior to the institution of the receivership proceedings. By using four years instead of three for 1927, two abnormal conditions are escaped in large measure. I am convinced that, regardless of how the use of this period works out, what I have said is ample to justify its adoption. The relative track mileage factor of allocation for 1927 is 9.09.

Using the same factors or elements in arriving at the value for this year as were used for 1926, the following results are obtained: The stock and bond value averaged over a four-year period, and deducting $19,-001,619 for nonoperating property, that being the correct figure for 1927, the result is

a system value of $348,605,531. Using net operating income capitalized at 6 per cent. averaged over a period of four years, the system value is $310,034,950. The Interstate Commerce Commission valuation supplemented and extended shows a system value of $597,508,193. Applying the same percentages of weight to these elements as were used for 1926, that is, taking 40 per cent. of the result obtained by the stock and bond method, we get a figure of $139,442,212; applying 40 per cent. to system value found by the capitalized net income method, we get a figure of $124,013,980; and, applying 20 per cent. to cost of reproduction system value, we get $119,501,639. Combining these figures gives a total system value of $382,957,831. Applying an allocation factor of 9.09 to the system value found gives a valuation to the state of Washington in the sum of $34,810,867, as compared with the assessed valuation of $50,100,000, or an overvaluation for the year 1927 of $15,289,133, or a percentage of overvaluation of 43.92.

Counsel for the Milwaukee Company contend that the special master erred in failing to find that the overvaluation made by the tax commission was entirely upon real operating property of the company and in making his calculations upon the basis that a part of such overvaluation was upon the operating personal property. It is insisted that, since the company makes no complaint as to the valuation of its personal property, the entire amount of overvaluation must be found in real operating property. The special master found, and I find, that the overassessment inheres in both real and personal property. I do not see how this conclusion can be escaped, and the mere fact that the complainant elects not to insist upon an overvaluation of its personal property does not entitle it to a credit for the amount of that excess upon the valuation of its real property. The special master found that the excess of overvaluation should be distributed as between the two classes of property in proportion that each class bears to the entire amount of overassessment. In this I think he was clearly right. The complainant cannot, by voluntarily waiving overassessment as to personal property, prevent the court from finding the truth as to the value of the real property. When it waived its claim for overvaluation with respect to personal property, it was waived for all purposes. Pursuing the same method as that employed by the special master, I find the value of the real property for 1926 to be $32,105,184. Since operating personal property is not involved, that amount will stand as fixed by the tax commission, namely, $4,108,200. Using the same method for 1927, the value of the operating real property is found to be $31,956,376. The personal operating property is the same as for 1926, $4,108,200.

Exception is taken by the Milwaukee Company to the action of the special master in excluding certain counties in measuring the relief due the company arising out of excessive base value. These counties were eliminated because of the lack of the requisite jurisdictional amount. This action by the special master undoubtedly was due to a misunderstanding of a ruling made by the court when considering the pleadings and making up the issues in the cases. For 1926 Grays Harbor, Kitsap, Lincoln, and Yakima counties will be restored, and for 1927 the same counties, and, in addition, Jefferson county, will be restored.

Finally, in base valuation I reach the case of the Spokane, Portland & Seattle Company. In view of my discussion earlier in this memorandum, I do not feel that much additional need be said concerning this valuation. For reasons already indicated, I shall take net income averaged over a period of three years and capitalized at 6 per cent. Here we have no stock and bond valuation, but we do have a case where there is no contention that the road is not competently and economically managed and operated. It is conceded by all that the Spokane, Portland & Seattle road is one of the best constructed railroads in the country and enjoys many exceptional physical advantages in the way of grades and the like. It is undoubtedly capable of additional future demands which may be made upon it. It, like the other roads, has been constructed with an eye to the future, and provision has been made in advance to meet future developments. And, in view of the fact that the road is owned in equal shares by the Northern Pacific Company and the Great Northern Company, and that this ownership may give rise to the operation of the property in a manner which does not entirely reflect its actual earning capacity if no such joint ownership existed, and to be sure that no legitimate element of value is overlooked, I feel that it is equally permissible in this case to take 80 per cent. of system value as found by the net operating income method and 20 per cent. of reproduction cost. By using 20 per cent. of reproduction cost, there is added to the value of the entire system $5,091,186, which, when allocated to the state of Washington, results

in increasing the valuation in that state in the amount of $3,759,332. In this way, I feel satisfied, a fair and just determination will be made, no matter from what viewpoint it may be considered.

The value of the system under the net operating income method is $31,643,083. The value of the system on the basis of reproduction, as shown by the extended and supplemented valuation report of the Interstate Commerce Commission, is $57,099,013. By taking 80 per cent. of net operating income value, the result is $25,314,466. By taking 20 per cent. of reproduction cost, the amount found is $11,419,803. The sum of these two results gives a grand total of system value of $36,734,269. Allocating the system base value to the state of Washington by the use of the factor of allocation already stated, 73.84, the part of system value in the state of Washington is ascertained to be $27,124,584. The company for this year was assessed by the tax commission at $36,000,000, or an overvaluation in amount of $8,875,416, a percentage of overvaluation of 32.72.

This value can be segregated as between real and personal operating properties in the same manner as that used by the tax commission and as announced in the Northern Pacific case.

In placing my valuations upon the properties, I have not undertaken to devise an ideal method of ascertaining the taxable value of railroad operating properties. I have merely attempted to perform in a practical way an inescapable task, in order to work out the equities of the cases under review.

My views and conclusions with respect to the validity of the assessments complained of, so far as base value is concerned, were such that it was not necessary to discuss the contentions of the Milwaukee Company and the Northern Pacific Company that the state board of equalization denied the companies the hearing provided by the Washington statute and required by the state and Federal Constitutions. Before taking up the question of ratios, I shall notice this question.

The contentions of the complainants do not challenge the regularity or sufficiency of the hearings before the tax commission, so it must be assumed that complainants enjoyed in that regard all that they were entitled to under the law. Complaint is made of the character of the hearings accorded the complainants before the board of equalization. The stipulated facts giving rise to these contentions are that the board refused the requests of the complainants for information as to the data upon which and the methods by which the members of the board, sitting as the tax commission, had arrived at the valuations placed upon their properties; that no witness appeared or testified at the hearings before the board of equalization other than those called by the complainants; that no attempt was made to question the credibility of or to impeach these witnesses; that no evidence was offered controverting their testimony; and that no evidence was offered as to the valuation of the properties other than that offered by complainants' witnesses. In consequence of this it is argued that complainants were deprived of such a hearing as the statute intended should be accorded them, and also that they were denied due process of law, as guaranteed by the Fourteenth Amendment to the Federal Constitution. Extensive arguments for and against both these propositions have been presented, and scores of cases, both state and federal, have been cited and discussed. I shall not go into these contentions at great length, but some observations are in order.

The board of equalization, under the statutes of Washington, is composed of the members of the tax commission (Rem. Comp. Stat. Wash. Supp. 1927, § 11087—11). The tax commission is given general supervision and control of the tax laws of the state to the end that all taxable property shall be valued and assessed according to law. The board of equalization meets annually in the month of September, and may remain in session but twenty days. All the duties which the board is called upon to perform relating to the whole state must be discharged within this brief period of time. After being in session twenty days, it becomes functus officio. The board is given no power to subpœna witnesses or to administer oaths, and there is no specific requirement in the statute that it shall receive evidence. It is the practice of the board to divide its hearings into two classes. First it hears assessors, other taxing officers and individuals on the question of the ratio of assessed to actual value of the property in all the counties of the state. It then takes up the cases of the railroad and telegraph companies and hears such evidence and arguments as they have to present. Under the statute (section 43 of Act 1925) every railroad company is entitled, on its own motion, to a hearing and to present evidence before the tax commission relating to the value of the property of such company, "or to the value of the general property of the state." It is provided that this hearing shall

not impair the right to a further hearing before the state board of equalization, as provided in the act. The tax commission, after concluding its railroad hearings, which may be held at any time between April 1 and May 1, prepares assessment rolls and places thereon, after the name of each railroad company assessed, a general description of the property of such company and the amount of the assessment. The commission thereupon gives notice by mail to each railroad company of the amount of its assessment as entered upon the assessment rolls. The tax commission is given full power to issue subpœnas for witnesses, subpœnas duces tecum, and to administer oaths. Provision is made for the issuance of attachments to enforce the attendance of witnesses and to compel the production of books and records, and also for the taking of depositions if such are required. Upon the application of a railroad company, the commission appoints a time and place for a hearing and evidence is submitted in a quasi or semi judicial manner. After making up its assessment rolls in the manner indicated, the tax commission submits them to itself sitting as the state board of equalization at its annual meeting in September, held "for the purpose of equalizing the assessed valuation of the taxable property of the state; and any railroad or telegraph company interested shall have the right to appear and be heard as to the assessment of the property of such company and as to the value and assessment of the general property of the state, and the said board of equalization, may, on application or on its own motion, correct the valuation or assessment of the property of such company, in such manner as may, in its judgment, make the valuation thereof just and relatively equal with the general property of the state." It seems clear to me that under this system the railroad companies are accorded everything essential to due process of law, as that term is understood in connection with matters of taxation. Before the tax commission they are accorded full opportunity, not only to be heard, but "to present evidence" relating to the value of their property or to the valuation of the general property of the state. If the statute had limited the railroad companies to presenting evidence as to the value of their property alone to the tax commission, it might very well be argued that before the board of equalization they would have the right to present evidence as to the value of the general property of the state, so that the board might correct the valuation or assessment of the property of such com-

panies "in such manner as may, in its judgment, make the valuation thereof just and relatively equal with the valuation of the general property of the state." Section 46. The mere assessment of the property by the tax commission does not require that the amount of other assessments, or the value of other property, shall be taken into account, but the process of equalization of course calls for the doing of that very thing. Assessing property involves the placing of a value upon it for taxation, but equalization of assessments involves the process of comparing values placed upon properties for the purpose of equalizing them. As the Washington statute makes the members of the tax commission the board of equalization, it provided for the taking of evidence before the tax commission, both as to the valuation of the railroad companies' property and the value of the general property of the state, so that information touching all aspects of the inquiry would be before these officials when they came to the task of equalizing values while sitting as the board of equalization. This hardly seems open to dispute. The tax commission does not assess the general property of the state, and the only use for information relating to the value of such general property is that the board of equalization may equalize values throughout the state and make just and relatively equal the assessment of the property of railroad and telegraph companies with the general property of the state. It is highly significant that the statute (section 43) providing for a hearing before the tax commission grants the railroad companies the right to a "hearing and to present evidence before said commission," while in the case of the hearing before the board of equalization the right granted is "to appear and be heard" (section 46). The significance of this distinction is accentuated when it is remembered that no powers are conferred upon the board of equalization to call witnesses, take testimony, or administer oaths. In these cases the complainants had an adequate hearing before the tax commission. In addition, they were advised of the amount of their assessments, and on appearing before the board of equalization were permitted to introduce all the evidence which they desired to offer. They were accorded and enjoyed the right to appear and be heard before the board of equalization. This, I am convinced, is all that the statute of Washington requires. It is elementary that one full hearing is all that due process of law requires, and, when the statute granted the right to appear and be

heard before the board of equalization with respect to adjusting inequalities between assessments, that is all that due process requires in matters of taxation. Pittsburgh, etc., Railway Co. v. Backus, supra. The incidents of a judicial trial are not essential to due process, especially with respect to the assessment and taxation of property. Due process of law in taxation is that which is due and appropriate in that class of cases, and it is uniformly held by both state and federal courts that due process of law in taxation does not require regular, or, for that matter, any judicial, procedure. Governments must have their revenues promptly and without delay, and from the very necessities of the case summary proceedings must be resorted to in the assessment and collection of taxes. To be sure, the process of assessing and equalizing property for taxation is inherently somewhat judicial in its character, but it has never been held that the formalities of judicial trials must be followed in making assessments or in adjusting inequalities between or amongst assessments.

 Counsel for the Milwaukee Company, in their excellent brief, say: "Due process of law, as applied to a hearing before an administrative board acting in a quasi judicial capacity, requires such board to act only upon and in accordance with testimony openly introduced, after due notice to the party who may be adversely affected by the ruling, and with full opportunity afforded such party to defend, not only by introducing competent testimony and by argument, but by cross examination of adverse witnesses and having the opportunity to meet, refute and explain any and all adverse testimony which may be considered. It thus prohibits such board acting upon testimony not so openly introduced, or upon matters within the private knowledge of the board or of the members thereof."

Whatever may be said of this comprehensive and carefully worded definition of due process of law in its relation to some classes of cases, it is too plain for serious debate that it will not do as a definition of due process in the realm of taxation. Its adoption in that field would be not only to go counter to the customary usages of the people, both in this and in the mother country, for centuries, but it would imperil the public revenues and thereby threaten the very existence of government itself.

"* * * Taxes have not, as a general rule, in this country since its independence, nor in England before that time, been collected by regular judicial proceedings. The necessities of government, the nature of the duty to be performed, and the customary usages of the people, have established a different procedure, which, in regard to that matter, is, and always has been, due process of law." Kelly v. Pittsburgh, 104 U. S. 78, 80, 26 L. Ed. 658.

"It has, however, been repeatedly decided by this court that the proceedings to raise the public revenue by levying and collecting taxes are not necessarily judicial, and that 'due process of law,' as applied to that subject, does not imply or require the right to such notice and hearing as are considered to be essential to the validity of the proceedings and judgments of judicial tribunals." Kentucky Railroad Tax Cases, 115 U. S. 321, 331, 6 S. Ct. 57, 60, 29 L. Ed. 414.

"Due process of law in each particular case means such an exertion of the powers of government as the settled maxims of law permit and sanction, and under such safeguards for the protection of individual rights, as those maxims prescribe for the class of cases to which the one being dealt with belongs." Storey on the Constitution (5th Ed.) § 1945.

No case has been cited, and I have found none, where the Supreme Court of the United States has ever declared the tax procedure of a state invalid because of lack of notice or hearing, though numerous cases of alleged want of due process of law in such matters have been presented to it. Under a statute like that of the state of Washington I must refuse to pioneer that field. All courts uniformly insist that there must be a substantial failure to afford due process of law before they will interfere with the taxing system established by the state, and this rule is applied with especial force in federal courts in the exercise of their jurisdiction under the Fourteenth Amendment. Nor do I think that there was any lack of due process because the board of equalization denied the request of complainants to furnish them with the data upon which and to state to them the methods by which the assessments under review were made. As aptly said by that venerable jurist, Judge Cochran, in Louisville & Nashville R. Co. v. Bosworth (D. C.) 209 F. 380, 439: "The claim is that the board failed to inform it [the railroad company] as to the method by which it had reached such assessment, and, without its knowledge, used a report by it to the Railroad Commission in reaching the conclusion which it came to; and that by reason thereof it had no opportunity to be heard as

to those matters, and hence was denied such hearing as the statute contemplates. It is well settled that the assessment of property for taxation is a judicial function, and that the taxpayer is entitled to be heard in regard thereto before his property is assessed. But this right to a hearing does not involve a right to know in advance of the assessment the amount at which the assessor thinks the property should be assessed, and hence as to the method by which he has reached such amount. Ordinarily in judicial proceedings against one he is entitled to know specifically what is the charge against him. But this is not so as to the assessment of property for taxation. It is sufficient that the taxpayer has notice that his property is about to be assessed, and that he is given full opportunity to be heard as to the amount at which he thinks it should be assessed."

In these cases full and ample opportunity was afforded complainants by the statute to submit to the tax commission any evidence touching the value of their properties, or the value of the general property of the state, which they wished to present, and, presumably, they enjoyed the full benefit of this provision. The members of the tax commission, when they later sat as the board of equalization, had all this information and data before them ready at hand for use, and, in addition to this, the complainants were permitted to offer additional evidence before the board of equalization after they had been fully notified of the amount of the assessment which had been made against their properties respectively by the tax commission. It seems idle to say that the railroad companies had the right to appear before the board of equalization and cross-examine the assessors and other witnesses appearing informally before the board for the purpose of advising it as to the value of the properties in the several counties throughout the state. If one railroad company had this right, then all such companies possess it, and telegraph companies stand in the same class with railroad companies in this respect. That the statute contemplated no such thing is manifest, because only twenty days were allowed for the full performance of all the duties resting upon the board of equalization with respect to equalizing the values of the property in the thirty-nine counties of the state. A Tennessee statute (Acts 1887, c. 2, § 42) provided that the board of equalization should "carefully examine and compare and equalize said assessments," and it was empowered to "hear and adjust" complaints of excessive assessments. This statute came under review by the Supreme Court of that state in the case of Tomlinson v. Board, 88 Tenn. 1, 12 S. W. 414, 6 L. R. A. 207. In that case, a taxpayer complained to the board of an excessive assessment and produced, and asked permission to examine, certain witnesses and others which he desired to call, for the purpose of showing the overvaluation of his property. The board refused to hear the witnesses, and proceeded to approve the assessment. The case went up on certiorari; complaint being made of the refusal of the state board to hear his witnesses. The opinion in the case was written by Judge Lurton later Mr. Justice Lurton. In the course of his opinion, at page 416 of 12 S. W., 88 Tenn. 1, 6 L. R. A. 207, he said: "To hold that it was the duty to permit the examination of witnesses offered by a complainant would imply a duty to the state and county to hear and examine witnesses to sustain the assessment. All this would imply a trial, and a judgment upon weight of proof. The question of valuation is altogether a matter of opinion. Before questions of opinion the greatest diversity may be expected. The sessions of this board terminate in two weeks; and at the end of that time they are required to return the assessment lists, and their corrections, to the clerk of the county court. In populous counties the assessments reach into the thousands. That each tax-payer should have the right to come with his witnesses, and have them heard, and be heard by counsel, would result in such delay and embarrassment as to amount to a great public peril with regard to the assessment of the public revenues. No legislative body could have seriously contemplated such a tribunal to determine a mere question of an excessive valuation for purpose of assessment. Occasional instances of excessive assessments may occur; but they had better be borne than that such a court should be created to settle them."

In that case only one county was involved, but here the action of the state board of equalization is challenged, and its duties extend throughout the length and breadth of the state. The statute of Washington did not undertake to confer upon the complainants any such right of examination and cross-examination as that for which they contend, and surely such a right is not essential to constitute due process in matters of taxation under the Fourteenth Amendment. In dealing with the question of due process in re-

spect of taxation one must be careful not to be misled by general statements defining the essentials of due process of law in other fields, and with respect to entirely different classes of cases. What is due process of law in one class of cases may not be due process in another. In matters of taxation, due process of law must be considered in a class by itself because of the necessity of the sovereign government to have its revenues promptly and at the appointed time. This distinction has been uniformly recognized by the courts, both before and since the adoption of the Fourteenth Amendment.

Finally, in connection with this point, it is claimed that the action of the board of equalization was invalid because it did not challenge the testimony introduced before it by the complainants and did not controvert it by offering evidence itself and that in its work of equalizing assessments it had no right to act upon anything other than evidence duly introduced before it. The testimony which had been taken before the tax commission could not fail to be in the minds of the board of equalization made up of precisely the same individuals and, if full information was not given to the commission by the complainants, they were offered and took advantage of the opportunity of supplementing it before the board.

 It is earnestly argued in behalf of the complainants that the board of equalization is confined as a matter of law to the evidence submitted to it during its sittings, and that it may not act in whole or in part upon its own information and knowledge. If this question has been decided by the Supreme Court of Washington, its decision is binding upon me. If that court has not dealt with the question, and the disposition of these cases requires that it shall be decided, then, of necessity, I must treat the question as an open one and decide it for myself.

In Olympia Water Works v. Gelbach, 16 Wash. 482, 48 P. 251, a county board of equalization had notified a property owner to appear and show cause why the amount of its assessment should not be increased. It appeared and introduced evidence which showed the property was of less value than that placed upon it by the assessor. No other evidence was introduced, yet the board increased the amount of the assessment. It was contended that the board had no authority to do this, but the court held "that the board were entitled to rely in a measure upon their own knowledge and judgment as to the value of the property, and were not bound by the testimony offered, nor to keep within the values placed thereon by the witnesses." The case of State v. Public Service Commission, 95 Wash. 376, 163 P. 1143, 166 P. 793, was a direct appeal from an order of the Public Service Commission establishing joint railroad rates with milling privileges in transit. In the course of the opinion of the court, at page 385, of 95 Wash., 163 P. 1143, 1146, it is said: "We have given the foregoing quotation from the decision of the commission in this case for the reason that, besides stating some of its arguments, the quotation also contains some findings of fact which we think the commission as an administrative and regulative body has peculiar powers to determine. It is not bound, as is a court, to acquire its information concerning all matters involved in the proceeding before it wholly and entirely from the evidence of witnesses or other evidence produced before it, but may take into consideration the results of its general investigations, general information upon a given subject within its powers, and all matters which affect the matter and concerning which it must determine the facts."

It is true this case is not one dealing with assessment and taxation of property, but if the Public Service Commission is not bound, as is a court, to acquire its information solely from witnesses, but may act upon its own information and the results of its own investigations, it is not perceived why, in the still less restricted field of taxation, the board of equalization is bound, as is a court, and must act exclusively upon evidence produced before it. I should be inclined to think that there is much greater room to doubt the right of the Public Service Commission to act upon its own information than there is to question the right of the board of equalization to do so. See Interstate Commerce Commission v. Louisville & Nashville Railroad, 227 U. S. 88, 33 S. Ct. 185, 57 L. Ed. 431. In the case of Byram v. Thurston County, 141 Wash. 28, 251 P. 103, 109, 252 P. 943, the Supreme Court of this state had before it a question of assessment for taxation involving the action of the board of equalization. In referring to a California statute, the court said: "The statute itself does not require that the board shall act only upon evidence, but the courts have apparently adopted that rule. City of Oakland v. Southern Pacific R. Co., 131 Cal. 226, 63 P. 371. We have adopted a similar rule in this state as to the state board of equalization. State

ex rel. O. R. & N. Co. v. Clausen, 63 Wash. 535, 116 P. 7."

Upon a rehearing en banc, however, the court, in a per curiam opinion, said: "Upon a reargument of this case En Banc, it appears to the court that that portion of the department opinion * * * wherein reference is made to the rule in the state of California in regard to the production of evidence before the equalization board and the statement is made that a similar rule obtains in this state should be stricken for the reason that it was not necessary to the decision of this case and the court is desirous of leaving this an open question to be determined when squarely presented to it."

Inasmuch as the Supreme Court itself has said that the question is an open one, I am relieved from any embarrassment in dealing with it as such, and shall not pause to analyze the Clausen Case referred to in the departmental opinion.

 After a careful study of the cases and texts, I am convinced that it is established by the overwhelming weight of authority that, in the absence of statute to the contrary, a board of equalization, by whatever name called, is an administrative agency, not a judicial tribunal, and that it is not obliged, in reaching its determinations, to consider only evidence taken before it in the ordinary and usual way, but that it may base its action, at least in part, upon investigations of its members and their knowledge of values derived from experience and study. Mayor, etc., of City of New York v. Davenport, 92 N. Y. 604; People v. Pitcher, 61 Colo. 149, 156 P. 812, Ann. Cas. 1918D, 1185; Bunten v. Rock Springs Ass'n, 29 Wyo. 461, 215 P. 244; Hacker v. Howe, 72 Neb. 385, 101 N. W. 255; People v. St. Louis Bridge Co., 291 Ill. 95, 125 N. E. 752; People v. Millard, 307 Ill. 556, 139 N. E. 113; City of Tyler v. Rowland (Tex. Civ. App.) 297 S. W. 923; Symns v. Graves, 65 Kan. 628, 70 P. 591; State v. Lord, 137 Minn. 20, 162 N. W. 675; Star Milling Co. v. Board (Ky.) 125 S. W. 1051. These cases are selections made from a vast number because they are well reasoned and abundantly sustain the conclusions which they announce. If, however, there be doubt of the soundness of the view which I have just expressed, as a general proposition, it seems perfectly clear that, under the statute of Washington, the members of the board of equalization in this state are not confined to the evidence introduced before them as a board of equalization, but that they may act upon the evidence intro-

duced before them while sitting as the tax commission. And, in view of the method provided by the statute by which they shall qualify themselves for the performance of their duties, it would seem to follow that they have the right to use the information and knowledge which the performance of this statutory duty cannot fail to bring to them. The members of the tax commission, who, as we have seen, compose the board of equalization, are specifically directed by the statute "to secure, tabulate, and keep records of valuations of all classes of property throughout the state, and for that purpose to have access to all records and files of state offices and departments and county and municipal offices, and to require all public officers and employees whose duties make it possible to ascertain valuations, including valuations of property of public service corporations for rate making purposes, to file reports with the commission, giving such information * * * and the source thereof." Laws 1925, c. 18, p. 35, § 5, subd. 2. The commission is also directed to exercise general supervision and control over the administration of the assessment and tax laws of the state "to the end that all taxable property in this state shall be listed upon the assessment rolls and valued and assessed according to the provisions of law, and equalized between persons, firms, companies and corporations * * * and between the different taxing units and townships, so that equality of taxation shall be secured according to the provisions of law." Laws 1925, c. 18, p. 35, § 5, subd. 3.

Section 44, c. 130, p. 254, Extraordinary Session 1925, provides that, "for the purpose of determining the value of the property of each railroad and telegraph company appearing on the assessment rolls, the commission may, if deemed necessary, view and inspect the property of such company, and shall consider the reports filed in compliance with this act and the reports and returns of the company filed in the office of any officer of this state, and such other evidence or information as may have been taken or obtained bearing upon the value of the property of the company assessed." Under such legislation, it hardly seems reasonable to conclude that the members of the tax commission, when sitting as a commission, may act upon evidence taken and information obtained, but, when they come to sit as the board of equalization, they must act solely and exclusively upon the evidence which is introduced before them during their session of twenty days' duration. To so conclude would be to say

that the statute which required the commissioners to inform themselves so as to be competent to discharge their duties as tax commissioners made it extremely difficult, if not impossible, for them, to perform their duties as members of the board of equalization. I think it is obvious, under the statutes of Washington, that the members of the tax commission-board of equalization may act in either capacity upon information which they are enjoined to secure, both for assessing and equalizing purposes.

Some contention is made that the action of the board of equalization is invalid because it did not have before it the tabulations and records which its members are required to make and keep by section 53 of chapter 7, p. 33, Laws 1921. If it is meant to be argued that the board did not have before it records showing the recited consideration or the estimated consideration as shown by revenue stamps of private deeds of conveyance on file in the offices of the county auditors in the several counties of the state, the short and ready answer is that the statute does not require the compiling or filing of any such data or information. The commission is clothed with a discretion to secure such information concerning values as in the exercise of their judgment they deem best calculated to reflect the true value of property throughout the state. It will not do to read into a statute requirements which are not to be found within its provisions, and then predicate a charge of official misconduct on the failure to observe the portion thus imported into it. If it is claimed that the action of the board is invalidated because records and tabulations which its members are required to make and keep were not on file before the board, this contention is wholly without merit. Under the act of 1921, the board of equalization, called "the equalization committee," was composed of the Governor, the state auditor, and the state treasurer, who met annually for the purpose of equalizing assessments throughout the state, and therefore that statute required that the information concerning values obtained by the supervisor of taxation be filed before the equalization committee "for the use of the state equalization committee created by this act," to the end that "information as to property valuations in every section of the state" might be available to the committee. By the act of 1925, this equalization committee was abolished, and the present board of equalization was substitut-

ed in its stead, and the language of section 5 of the new law does not require that the tabulations and records prepared by the tax commission shall be filed before itself sitting as the board of equalization. It would be palpably absurd to require the members of the tax commission to file before themselves, while sitting as the board of equalization, tabulations, records, and information obtained by themselves. But, if the statute had so provided, it scarcely requires argument to demonstrate that the failure to file these data and records would not impair or destroy the validity of the action of the board. Such a requirement would be directory merely, not mandatory. French v. Edwards, 80 U. S. (13 Wall.) 506, 20 L. Ed. 702. Let it not be overlooked that the statute requiring the tax commission to obtain information concerning values in all parts of the state is for the purpose of enabling the commission to assess, not alone the railroad property in the state, but to enable them to supervise the assessment of all the property within its borders. If the filing of tabulations and records with the board of equalization is essential to the validity of the assessments of railroad property, it was equally essential to every other action taken by the board in the discharge of its official duties in equalizing the assessments of the state. Surely the validity of the assessment of property for taxation, upon which depends the raising of revenue for the maintenance of the government, does not hang by so slender a thread. The obtaining or filing of the information which the statute contemplates is not a prerequisite to the jurisdiction of the board. It is merely data for its use while engaged in the performance of its duties in the exercise of its jurisdiction. This seems so plain as hardly to justify lengthy citation of authorities. I shall merely call attention to the case of Mayor, etc., of City of New York v. Davenport, 92 N. Y. 604.

At last I reach the question of county ratios. By the act of 1913 it is provided that all property shall be assessed at not to exceed 50 per cent. of its true and fair value in money. Under this statute the county assessors do not follow a uniform standard of valuation. Consequently the act of 1925 requires the state board of equalization to determine at its annual September session the ratio of assessed value to actual value which obtained in each county for that assessment year. This determination is for the

purpose of ascertaining what proportion of the taxes necessary for the support of the state government shall be paid by each county, and the ratio so found is used as the ratio of assessed to actual value upon which railroad property in each county shall pay taxes. It is charged by the complainants that for the years covered by this litigation the board of equalization arbitrarily, in despite of evidence produced before it, and intending to discriminate against them, fixed a higher percentage of assessed to actual value in each of the counties through which their railroads operate than actually obtained in such counties. During the hearings before the special master, the Northern Pacific Company abandoned its charges of discrimination as to all counties of the state lying east of the Cascade Mountains. The Milwaukee Company did likewise, and, in addition, abandoned its charges as to all counties lying west of the Cascades save those through which the Northern Pacific Railroad runs. Clarke county alone is involved in the Spokane, Portland & Seattle case. By stipulation it was agreed that the evidence submitted in the case of the Northern Pacific Company should be considered in the Milwaukee and Spokane, Portland & Seattle cases.

The general property in Washington is assessed by the county assessors. Their work goes to county boards of equalization for review where valuations are so adjusted as to bring about as near as may be equal valuations in the county. When this work is concluded, the assessor corrects his assessment rolls so as to conform to the action of the county board of equalization, makes out duplicate abstracts of the rolls, and forwards one copy to the state board of equalization for its use. Laws 1925 (Ex. Sess.) p. 271, § 68. The state board of equalization is required to "examine and compare the returns of the assessment of the property in the several counties of the state, and the assessment of the property of railroad and telegraph companies, and proceed to equalize the same, so that each county in the state shall pay its due and just proportion of the taxes for state purposes for such assessment year, according to the ratio the valuation of the property in each county bears to the total valuation of all property in the state." Laws 1925 (Ex. Sess.) p. 273, § 70. At the same session the board levies the state taxes authorized by law and apportions the amount of the tax for state purposes levied by the board amongst the several counties in proportion to the valuation of the taxable property of the county for the year as equalized by the board. Laws 1925 (Ex. Sess.) pp. 273, 274, § 70. The assessed value of railroad property is allocated to the counties in which it is situated on a mileage of line basis. Laws 1925 (Ex. Sess.) p. 257, § 47. In actual practice the value apportioned to each county is adjusted to correspond to the percentage of assessed to actual value which the board has found to prevail in that county. To illustrate, if one-tenth of a railroad's mileage in the state is in Spokane county, one-tenth of the railroad's state base value is allocated to that county. If the board has determined that the general property in Spokane county has been assessed at 40 per cent. of its actual value, the railroad value allottable to that county would be equalized on the basis of 40 per cent., so that railroad property would be taxed on the same percentage of assessed to actual value that general property in that county is taxed. No question is made of the fairness of the law in this regard; the attack is upon its administration. Nor is it claimed that the properties of the complainants were assessed in excess of 50 per cent. of their true and fair value in money, the permissible maximum under the state statute. Their complaints in respect of ratios are confined to the charges of discrimination solely.

Now what is the standard of measurement when the action of an equalizing tribunal is thus assailed? A few cases will serve to define this standard with respect to which there can be little room for difference of opinion. In Albuquerque Bank v. Perea, 147 U. S. 87, 89, 13 S. Ct. 194, 195, 37 L. Ed. 91, Mr. Justice Brewer writing, it is said: "As to the tax of 1888, the case stands upon the allegation that plaintiff's property was originally assessed at its full value, while other property was assessed 70 per cent. thereof; that it appealed to the board of equalization for a reduction; and that such tribunal reduced the valuation, but only to 85 instead of 70 per cent. It would seem that the mere statement of this was sufficient. The law of New Mexico requires property to be assessed at its cash value. Confessedly, this plaintiff's property was assessed at 15 per cent. below that value. Surely, upon the mere fact that other property happened to be assessed at 30 per cent. below the value, when this did not come from any design or

systematic effort on the part of the county officials, and when the plaintiff has had a hearing as to the correct valuation, on appeal before the board of equalization, the proper tribunal for review, it cannot be that it can come into a court of equity for an injunction, or have that decision of the board of equalization reviewed in this collateral way."

In Coulter v. Louisville & Nashville R. R. Co., 196 U. S. 599, 25 S. Ct. 342, 345, 49 L. Ed. 615, the railroad company complained that its property was assessed at its full value, while the general property of the state was assessed at not to exceed 80 per cent. of its actual value, and that, in consequence, it had been discriminated against by the assessing officers and the state board of equalization. The lower court found the alleged discrimination clearly established and granted the relief sought. On appeal, the Supreme Court reversed this judgment. In the course of the opinion, Mr. Justice Holmes stated that the finding of the Circuit Court was probably correct that there had been a general undervaluation of land. He goes on to say, however: "The undervaluation in the counties, looked at from the point of view just indicated, also does not appear to have been such as to warrant the action of the court. It is not contended that a mere undervaluation would be enough. It is admitted that it must have been systematic and intentional. * * * Inequality, we repeat, is nothing, unless it was in pursuance of a scheme."

In Chicago, B. & Q. Co. v. Babcock, 204 U. S. 585, 27 S. Ct. 326, 51 L. Ed. 636, a similar ruling was made, the court holding that it is essential to relief in cases of this character that a scheme or an agreement to discriminate must be shown. In Chicago, G. W. Ry. v. Kendall, 266 U. S. 94, 45 S. Ct. 55, 57, 69 L. Ed. 183, Mr. Chief Justice Taft stated the rule applicable to cases of this kind in the following language: "It is not enough, in these cases, that the taxing officials have merely made a mistake. It is not enough that the court, if its judgment were properly invoked, would reach a different conclusion as to the taxes imposed. There must be clear and affirmative showing that the difference is an intentional discrimination and one adopted as a practice."

One of the leading cases dealing with this question is Taylor v. Louisville & N. R. Co. (C. C. A.) 88 F. 350, 373. Judge Taft, speaking for the court made up of himself and Judges Lurton and Severens, said:

" * * * They merely emphasize the point that equity will not relieve against an assessment merely because it happens to be at a higher rate than that of other property; that such inequalities, due to mistake, to the fallibility of human judgment, or to other accidental causes, must be borne, for the reason that absolute uniformity cannot be obtained; that, in other words, what may be called 'sporadic cases of discrimination' cannot be remedied by the chancellor. He can only interfere when it is made clear that there is, with respect to certain species of property, systematic, intentional and unlawful undervaluations for taxation by the taxing officers, which necessarily effect an unjust discrimination against the species of property of which the complainant is an owner. The reason for the distinction is obvious. The occasional and accidental discriminations are inevitable in every assessment, and are not likely to continue, because not the result of an illegal purpose on the part of any one. If equitable interference in such cases could be invoked, the obstruction to the collection of taxes would be so frequent as to be intolerable. More than this, an action to enjoin a tax is a collateral attack upon the judgment of a quasi judicial tribunal; and it cannot be justified except on the ground of an obvious violation of law, or something equivalent to fraud. It does not lie where the injury complained of arises only from the erroneous, but honest, judgment of the lawfully constituted tax tribunal."

See, also, Southern Railway Co. v. Watts, 260 U. S. 519, 43 S. Ct. 192, 67 L. Ed. 375; Sunday Lake Iron Co. v. Wakefield, 247 U. S. 350, 38 S. Ct. 495, 62 L. Ed. 1154; Sioux City Bridge Co. v. Dakota County, Neb., 260 U. S. 441, 43 S. Ct. 190, 67 L. Ed. 340, 28 A. L. R. 979.

The rule in Washington does not appear to be different. In Doty Lumber Co. v. Lewis County, 60 Wash. 428, 431, 111 P. 562, 563, Ann. Cas. 1912B, 870, Judge Gose writing, it is said: "The assessment of the property of others at a lower proportion of its value than that of a complaining taxpayer, which is not assessed at more than its fair cash value as required by law, does not make the tax invalid unless the assessment was fraudulently made."

Does the evidence in these cases amount to a clear, affirmative showing that there was in fact discrimination, and that the officers responsible for it were guilty of an inten-

tional violation of the essential principle of practical uniformity, or that they made the discrimination in pursuance of a scheme or an agreement to discriminate, or that they were guilty of conduct amounting to fraud, rather than the mere exercise of erroneous but honest judgment as members of a legally constituted tax tribunal? In the equalization of values between the counties, and consequently in determining the ratio of assessment for railroad property, the questions presented to the state board of equalization for determination are purely questions of fact, resting largely in opinion and judgment. A court must be very cautious before it overthrows, in a collateral proceeding, the action of sworn officers of the law solely upon the ground of an erroneous ascertainment of facts. It is not the province of courts, in such proceedings attacking the official conduct of legally constituted administrative agencies or boards, to set up their judgment on the facts for that of the officials to whom the duty of finding the facts is confided by legislative enactment. And, where fraud or intentional wrongful design on the part of such officials is the gist of the charge, the case must be made out by clear and convincing proof; all reasonable presumptions in favor of honesty, good faith, and proper discharge of official duty being indulged in their favor. The object in ascertaining the ratio of assessed to actual value in the several counties is to enable the board of equalization to properly apportion the burden of state taxation amongst the counties of the state. The use of these same ratios in equalizing railroad property is somewhat secondary or incidental.

Under the method which I have attempted earlier to describe, it seems perfectly obvious that the state board of equalization cannot intentionally or fraudulently discriminate against railroad property without at the same time practicing the same intentional or fraudulent discrimination as amongst the counties of the state, unless like discriminating ratios are uniformly fixed throughout the thirty-nine counties of the state. I do not feel justified in concluding that such uniform discrimination was in fact practiced, in face of the varying ratios found by the board for the counties of the state, and especially in face of the fact that the Northern Pacific Company assails the ratios in only eleven of the twenty-four counties through which its railroad runs. It is true, proof of motive is not essential in establishing either crime or fraud, but absence of motive always is an important con-

sideration in determining whether crime or fraud has been committed. In the absence of motive, I find it difficult to conclude that in eleven counties of the state the board of equalization intentionally and fraudulently fixed unduly high ratios, thereby enabling those counties to escape their fair share of the public tax burden, while at the same time enjoying an unjust share of railroad taxes.

The character of the evidence relied on by the complainants in support of their charges of discrimination must now be noticed. The principal evidence tending to establish undervaluation of general real property, and without which complainants would have no case, was that tending to show the recited or "revenue stamp" estimated consideration in private deeds of conveyance on record in the auditors' offices in the counties affected. The manner in which this evidence was brought into the record was substantially this: Persons employed by the complainants went through the records of deeds and endeavored to select therefrom such as they thought proper to be considered. These selections were made under written instructions carefully designed to exclude any but apparently bona fide money transactions. No complaint is made by the defendants that the selections made were designedly unfair. They do insist, however, that by leaving the selections to the judgment of the paid employees of the complainants, and allowing them to decide what deeds to abstract and what to put aside, the admissibility of the result of their labors is challenged, and certainly the weight and convincing force thereof are weakened. From the selected deeds, the searchers set down the description of the property and the amount of the consideration stated or shown by attached revenue stamps. None of the other provisions of the instruments was included. These notes were then taken to the assessors' offices, and the assessed value of the properties covered by the deeds was inserted. Hundreds of deeds were handled in this manner. Abstracts showing the information thus obtained were offered and received in evidence over the defendants' objections. Controverting evidence was offered by the defendants, and able counsel in their behalf expended much time, pains, and industry in an effort to show the unreliability of the abstracted data. Extreme care was taken by the special master to see to it that no unfairness was practiced and abstracts of deeds of questionable reliability were cast aside. From the evidence thus adduced, the

special master found the proper ratios in the eleven counties involved were as follows:

| County | 1925 | 1926 |
|---|---|---|
| Clarke | 31% | 33% |
| Cowlitz | 34 | 35 |
| Grays Harbor | 31 | 31 |
| King | 35 | 36 |
| Lewis | 35 | 39 |
| Pacific | 35 | 44 |
| Pierce | 34 | 34 |
| Skagit | 32 | 33 |
| Snohomish | 37 | 38 |
| Thurston | 29 | 31 |
| Whatcom | 36 | 40 |

The ratios found by the board of equalization for these counties were:

| County | 1925 | 1926 |
|---|---|---|
| Clarke | 39% | 40% |
| Cowlitz | 40 | 40 |
| Grays Harbor | 35 | 35 |
| King | 46 | 48 |
| Lewis | 38 | 40 |
| Pacific | 40 | 48 |
| Pierce | 42 | 44 |
| Skagit | 36 | 37 |
| Snohomish | 40 | 40 |
| Thurston | 35 | 39 |
| Whatcom | 40 | 42 |

There is conflict in the authorities on the question of the admissibility of the "deed consideration" evidence, to which I have just adverted. Ordinarily recitals in a deed are competent as admissions by the parties to the instrument and their privies, but are not evidence against strangers to it, except in case of ancient deeds, which are not involved here. In other than taxation cases this rule is quite uniformly applied. But in tax cases there appears to be a difference of opinion among the courts. In People v. McCarthy, 102 N. Y. 630, 8 N. E. 85, there was present a question of discrimination arising out of the action of the board of equalization for the state of New York. In that case abstractors had been employed to search the records and compare the considerations in deeds with assessments on the same properties; the method employed being quite similar to that used in the instant cases. No fault was found by the court with the method of selection. At page 87 of the opinion in 8 N. E., this language is found:

"There would seem to be no reasonable objection to the reception and consideration by the state board of the information furnished to them by the relator, to be accorded such weight and influence as they might deem it entitled to; and we have no reason to suppose that this consideration was not given to it; but we think the relator has ascribed to the information offered an importance altogether disproportionate to its real value when it claims that it shall be regarded as decisive evidence upon questions of value. The sums inserted in the deeds referred to were not authenticated in such a manner as to make them evidence of the actual consideration, even if the price paid on sales of real estate between individuals should be deemed admissible at all as evidence of value. We think it quite clear, however, that such price is not in any view competent evidence of value. Bouv. Inst. 1224. No rule of law requires the true consideration to be inserted in conveyances of real estate, and it is within the common knowledge of all conveyancers that the amount stated therein is often determined by fanciful, capricious, and arbitrary considerations which render it utterly unreliable as evidence of value. It is frequently depressed by forced and unnatural sales, and enhanced by fictitious values placed upon property transferred in exchange, or deeded in settlement of disputed claims, or given from considerations of affection, liberality, and duty, and is, at the best, but the opinions of the grantors and grantees of its value, or a declaration by them of the price placed by them upon the property. Such prices have usually been held inadmissible as evidence of value in actions relating to the property, for the reason that they are liable to be influenced by too many causes aside from the actual value to be regarded as competent evidence of that fact. Roe v. Hanson, 5 Lans. 305. Prices obtained upon public sales are, for obvious reasons, considered some proof of the value of the property sold, and are receivable as evidence upon the question of value. Campbell v. Woodworth, 20 N. Y. 499. The usual method, however, of proving value in legal proceedings, is by the testimony of witnesses who express their opinions under oath as to such value, based upon their knowledge of the subject-matter and familiarity with the circumstances bearing upon the question."

In Iowa Ry. & L. Corp. v. Board, 209 Iowa, 687, 228 N. W. 623, 625, complaint was made of discrimination because of disparity between the assessment of the plaintiff's property and that of other property in the same taxing unit. The plaintiff offered in evidence to sustain its case records of deeds and assessment rolls of the same property.

209

After examining authorities, including the case of People v. McCarthy, supra, the court held: "We are disposed to follow the rule of these cases, and hold that the recitals in the deeds as to the consideration was not admissible in behalf of the appellant for the sole purpose of proving the value of the property described in said deeds. Even between the parties, a recital of consideration is, like other admissions, disputable so far as concerns the thing actually received. Wigmore on Evidence, § 2433. The value of real estate is generally proven by the expert testimony of witnesses shown to be competent to testify. Such witness gathers his knowledge from many different sources, and it may well be that the knowledge of such a witness of the actual consideration paid for transfers of real estate is a proper item for the witness to take into consideration as the basis for his opinion. * * * The appellant, however, in the instant case, did not seek to prove value by any witness whose qualifications might have been tested on cross-examination, but contented itself with offering merely the record of the deeds themselves, on the theory that the consideration recited therein was sufficient as between these parties to establish the value of said property. As we have seen, the evidence in this state of the record was not admissible for said purpose, and the court did not err in rejecting it."

In Washington County v. First National Bank, 35 Idaho, 438, 206 P. 1054, 1056, the Supreme Court of Idaho had under consideration a case where similar evidence for the same purpose was offered. In holding it inadmissible, the court said: "Respondent contends that the statement of consideration in a deed can be relied on as fair proof of the actual value of the property. In relaxing the strict rules of evidence, by way of exception to the hearsay rule, in order to meet the needs of particular cases, the courts have always applied two tests: First, was the declarant possessed of sufficient knowledge to make his statement reliable; and, secondly, was he free from any motive to misrepresent? 4 Chamberlayne on Evidence, §§ 2773, 2792, 2798. Let us apply these tests to the recitals of consideration in the deeds. It must be conceded that the grantor and grantee knew the true consideration. It is not at all clear, however, that they were free from a motive to misrepresent. They were under no duty to speak the truth in this regard. It is a matter of common knowledge that frequently an amount greater than the actual consideration is stated in order to make the property ap-

pear of greater value than it is. This objection is not offset by the fact that revenue stamps had to be used, because overstating the consideration would be no violation of the law. We conclude that the recital of consideration in a deed does not carry with it such a presumption of verity or reliability as will justify admitting it, by way of exception to the hearsay rule, as proof of value; that the deeds were not proper evidence of the value of the lands, and the testimony of the witnesses, so far as based upon these deeds, was not admissible."

In People ex rel. Miller v. C., B. & Q. R. Co., 300 Ill. 399, 133 N. E. 325, 327, evidence of like character and for the same purpose was offered. In sustaining the admissibility of this evidence, the Supreme Court of Illinois said: "Where the originals that are to be introduced in evidence consist of numerous documents, books, papers, or records which cannot conveniently be examined in court, and the fact to be proved is the general result of an examination of the whole collection, evidence may be given as to such result by any competent person who has examined the documents, provided the result is capable of being ascertained by calculation."

After citing authorities, the court went on to say: "Under these authorities we think Banes' testimony as to the result of his examination of the original records of Massac county was properly admissible."

There are also a number of cases where evidence of this character has been introduced and considered, though it does not appear what, if any, question of competency was raised against it. In Coulter v. Louisville & N. R. Co., supra, however, in referring to evidence of this kind required by the statute of Kentucky to be obtained, the Supreme Court, at page 609 of 196 U. S., 25 S. Ct. 342, 345, had this to say: "It is obvious that the accidental sales in a given year may be a misleading guide to average values, apart from the testimony that some, at least, of the conveyances did not report true prices, yet they furnish the chief weapon of attack."

Because of the necessities of the case and of the fact that evidence of this sort seems to be the best that it is practicable to submit, I venture to think that, in tax cases such as these, evidence of the character indicated may very well be admitted as an exception to the general rules to which it goes counter. In Washington Water Power Co. v. Kootenai County, in the United States District Court for Idaho, Judge Dietrich seems to have entertained similar views. His opinion is not

reported [1], but reference to it will be found in the case of Washington County v. First National Bank, supra. But to say that such evidence is admissible is not to free it from its inherent weakness, or to increase its weight and convincing force. No court holds that such evidence is conclusive proof of value, and its lack of decisive force cannot well be denied. People ex rel. Mayor v. McCarthy, supra; Chicago & N. W. Ry. Co. v. Eveland (D. C.) 285 F. 425. Where a taxpayer assails the official action of an equalizing tribunal, he must discharge the burden which the law places upon him, and difficulty in performing a task cannot be accepted as equivalent to performance.

The size and character of the record in these cases are such that it has not been possible for me to go into the evidence in minute detail. Hearings before the special master were commenced on June 6, 1927, and continued, with brief interruptions, until September, 1928, and the entire evidence was not completed until January, 1929. The testimony transcribed and filed with the special master comprises thirty volumes, containing a total of over thirteen thousand pages. There were introduced 2,944 exhibits, varying from one to a thousand sheets in size. All told, and including briefs of counsel, the record weighs close to a ton. The major part of this vast mass of material has to do with the question of county ratios. The evidence in this respect being chiefly documentary, the rule of seeing and observing the witnesses is not involved. I feel that by the use of the report of the special master, abstracts of the evidence, elaborate briefs, and by frequent and constant resort to the files, I have acquired a good, practical understanding of the evidence in regard to this feature of the case, as it relates to the eleven counties affected. I am sure no one at all familiar with the situation will expect me to enter upon a detailed discussion of the testimony dealing with ratios in each of these eleven counties. Suffice it to say that, after a careful perusal, I am thoroughly convinced that at the most the record discloses merely a general undervaluation of lands of varying degree in the different counties, but falls far short of a clear, affirmative showing of an intention to discriminate, and "inequality is nothing unless it was in pursuance of a scheme."

In the light of the whole record, I do not feel that enough has been shown to warrant the court in convicting the members of the board of equalization of intentional misconduct or fraud, which, perhaps, amount to the same thing. It would require nice thinking indeed to draw a practical line of demarcation between actual fraud and intentional violation of official duty to the direct and substantial injury of another whose rights it is the sworn duty of the official to safeguard and protect. In this connection, the following language in the brief in behalf of King, Pierce, and Spokane counties is so apt that I feel justified in adopting it: "The work of equalizers is one of unusual difficulty. It requires the comparison of values of many different species of property, situated in a wide and diversified territory, and affected by multifarious circumstances. It is patent, for instance, that the conditions on the west side of the State differ so widely from those on the east side that a standard of values applicable to one is utterly inapplicable to the other. In equalizing the assessed values in one county in the State with those of all the other counties, and of all with the ideal standard of 50% of actual value prescribed by the Legislature, there is unusual opportunity for the widest diversity of opinion, honestly entertained, among those who consider the problem. Where a pure matter of opinion is involved, even in problems much simpler than those presented to a state board of equalizers, it is certain that human minds will differ. It follows that there is no decision which such a board can make but can be proven erroneous if submitted to the decision of others—a master or a court for instance."

I conclude that the ratios fixed by the board of equalization must be allowed to stand, and that the defendants' exceptions in this respect should be sustained.

■ I have not overlooked the question of the omission of personal property from the assessment rolls, as shown by federal statistics, census reports, and the like. It unquestionably appears that a considerable amount of personal property was not assessed by the county assessors, due either to concealment or neglect, but this tends to show inefficiency or carelessness on the part of the local assessing officers, rather than to establish intentional misconduct on the part of the board of equalization. It is a matter of common knowledge that under our system of taxation a large amount of personal property habitually escapes the tax rolls, but this, as said in Mercantile National Bank v. New York (C. C.) 28 F. 776, 780, " * * * is a logical consequence of any system which attempts to reach personal property for direct taxation." I think it is settled law that the omission of

---

[1] Reversed, see (C. C. A.) 270 F. 369.

this property from the rolls does not affect the validity of the assessments here under review. Cooley on Taxation (2d Ed.) 216; Doty Lumber Co. v. Lewis County, supra; State ex rel. Bee Bldg. Co. v. Savage, 65 Neb. 714, 91 N. W. 716, 720; State v. Lakeside Land Co., 71 Minn. 283, 73 N. W. 970. In Weeks v. Milwaukee, 10 Wis. 242, 264, the Supreme Court of that state observes: "The execution of these laws is necessarily entrusted to men, and men are fallible, liable to frequent mistakes of fact and errors of judgment. If such errors on the part of those who are attempting in good faith to perform their duties, should vitiate the whole tax, no tax could ever be collected. And therefore, though they sometimes increase improperly the burdens of those paying taxes, that part of the rule which holds the tax not thereby avoided, is absolutely essential to a continuation of government."

Questions presented in the briefs and oral arguments which have not been noticed in this memorandum, such as res adjudicata in the Northern Pacific case, and the like, have been considered, and are thought to be without merit, or at least to have no controlling influence in the determination of the issues presented for decision. Before passing final decree, a time will be appointed, suitable to the convenience of counsel, for the disposition of all incidental matters, such as apportionment of costs, allowance to the special master, passing seriatim on the exceptions, and the like.

A decree in conformity with this memorandum will then be entered in due course.